Carol Lee CHAPMAN, by Ruby Chapman, her Guardian ad Litem, and Cecil H. Chapman and Ruby Chapman, his wife, Plaintiffs,

v.

Charles E. BROWN and Edith L. Brown, his wife, and Merle D. Chase and Helen Chase, his wife, d/b/a Around The World Gift Shop, a copartnership, Defendants.

Civ. No. 1837.

United States District Court
D. Hawaii.
Sept. 18, 1961.

80

John A. Roberts, Jr., of Hullin, Ehrlichman, Carrol & Roberts, Seattle, Wash., Martin Anderson, Tobias T. Tolzman, Honolulu, Hawaii, Anderson, Wrenn & Jenks, Honolulu, Hawaii, of counsel, for plaintiffs.

Joseph L. Hughes, Hughes & Jeffers, Wenatchee, Wash., Graves, Kizer & Gaiser, John G. Layman, Spokane, Wash., for defendants Edith L. Brown and Charles E. Brown, appearing separately.

Harold T. Kay, Honolulu, Hawaii, John G. Layman, Graves, Kizer & Gaiser, Spokane, Wash., for defendants Edith L. Brown, Helen Chase, Charles E. Brown and Merle D. Chase.

Roy A. Vitousek, Jr., Alan C. Kay, Harold T. Kay, Honolulu, Hawaii, John G. Layman, of Kizer, Gaiser, Stoeve, Layman & Powell, Spokane, Wash., Pratt, Moore, Bortz & Vitousek, Honolulu, Hawaii, of counsel, for defendants.

TAVARES, Chief Judge.

In this action plaintiff, Carol Lee Chapman, a then minor, by her mother, Ruby Chapman, as her guardian ad litem, joined with her parents, Cecil H. Chapman and Ruby Chapman, in suing the defendants, Charles E. Brown and Edith L. Brown, husband and wife, and Merle D. Chase and Helen Chase, husband and wife, for damages for injuries suffered by Carol caused by the burning of a hula skirt while Carol was wearing the same. It was claimed by plaintiffs that the hula skirt had been purchased by Mrs. Frances Leppard, an aunt by marriage of Carol, at a gift shop in Honolulu, Hawaii, known as the "Around the World Gift Shop", owned and operated by the defendants, or some of them. Mrs. Leppard, a resident of British Columbia, Canada, took the skirt back to her home. Somewhat over a year later Mrs. Leppard loaned the hula skirt to the plaintiff Carol Chapman, then a minor, to wear at a masquerade party held in a large hall in British Columbia, attended by several hundred people, at which function intoxicating liquors were consumed and there was much smoking and dancing, with cigarette butts left on the floor. At the end of the dance, while Carol and her party were sitting at a table waiting for the clean-up crew to clean the hall, the hula skirt worn by Carol caught fire from an unknown source, inferred to have been from a glowing cigarette butt on the floor, and the resultant fire was allegedly so explosive and intense that the parties were unable to smother the same or remove the skirt from her until it was practically all consumed, except the waist band, and Carol had suffered burns to about 75% of the skin on her body. The hula skirt was what was known as a Tahitian or Ponape type of skirt, made from fine fibers of the bark of the hau tree, these fibers being unwoven except for being tied or bound together in a band at the waist. Before the trial Carol attained the age of majority, and the guardianship ceased, and she became plaintiff in her own right. While Carol's parents were not dismissed as co-plaintiffs, Carol has assumed all obligations and expenses paid or incurred as a result of the accident, including amounts paid or incurred by her parents who are her co-plaintiffs in the action. It was agreed during the trial that no apportionment of damages need be made by the jury among any of the plaintiffs, this being left to the court in the event the question should be raised after the verdict, if a verdict favorable to plaintiffs was received. Under the circumstances, it being obvious to the court that the joinder or non-joinder of Carol's parents as co-plaintiffs would not affect the total amount of the damages, this decision will refer generally to Carol as though she were the sole plaintiff, it being understood that where the context so indicates, the other co-plaintiffs are included.

The defendants denied that the skirt had been purchased at the Around the World Gift Shop, hereinafter sometimes called the "Gift Shop" but, upon a special interrogatory, the jury found that it had been purchasd at that shop by Mrs. Leppard. At the time of the purchase, the business of the shop was being operated in the joint names of two of the defendants, Edith L. Brown, and Helen Chase, doing business as a general partnership duly registered as such under the laws of the State of Hawaii. Although the defendant husbands were not registered as partners, plaintiff claimed that they were in fact partners or principals or joint venturers in this enterprise, and the jury found on the evidence that Charles E. Brown was in fact a general partner or joint venturer along with Mrs. Brown and Mrs. Chase, but that Mr. Chase was not such a general partner or joint venturer. The plaintiff's case ultimately went to the jury on two general theories (1) alleged negligence of de-

fendants in selling an alleged dangerously flammable hula skirt without warning as to such dangerous flammability, and (2) alleged breach of an implied warranty of fitness of the hula skirt for use as an article of clothing. The jury found (a) in favor of the defendant Merle D. Chase on the ground that he was not a partner, or joint venturer, (b) in favor of all the defendants and against the plaintiff on the negligence claim, and (c) in favor of plaintiff and against defendants, Mr. and Mrs. Brown and Mrs. Chase, on the claim of breach of implied warranty.

The principal defenses set up by defendants, besides denial of any negligence or implied warranty, or breach thereof, were lack of privity between plaintiff Carol and any of the defendants, contributory negligence, assumption of risk, and failure to give notice of breach of implied warranty within a reasonable time.

At the close of the plaintiff's case, i. e., when plaintiff rested, and before defendants commenced to put on their defense, the defendants moved in effect for a directed verdict—to dismiss the plaintiff's complaint without recovery and with prejudice on various grounds, which will hereinafter be more particularly noted. After argument on this motion the court in effect reserved its decision on most points until the close of all the evidence. After both parties had rested, the defendants renewed their motion for a directed verdict, which motion was taken under advisement by the court. The jury brought in its verdict on April 29, 1961. Judgment was entered and noted on the docket by the clerk, pursuant to Rules 58 and 79(a) F.R.Civ.P., 28 U.S.C.A. on April 29, 1961, and a written judgment was filed on May 2, 1961. Motions (a) for judgment notwithstanding the verdict, and (b) in the alternative for a new trial, were filed by the defendants on May 5, 1961, well with-

in the period required by Rules 50(b) and 59(b).

■ The motion for a directed verdict after both parties had rested was based upon, and incorporated by reference, the same grounds as the earlier motion of defendants made at the close of plaintiff's evidence, and the motion for judgment notwithstanding the verdict incorporated by reference all of such previously stated grounds for the preceding two motions. Accordingly, these grounds will now be considered specifically, bearing in mind the rule requiring this court to adopt every favorable fact and inference fairly deducible from the testimony, and accept the evidence tending to support the verdict as true.[1]

I. The defendants contended that the evidence was insufficient to prove any or all of the plaintiff's contentions or causes of action as against any of the defendants. For reasons more particularly stated elsewhere in this decision, the court finds that there was sufficient evidence which, if believed by the jury, would justify the verdict found by the jury on the implied warranty cause of action.

II. It was claimed that plaintiff had failed to (a) allege and (b) prove the giving of reasonable notice to the defendants of her claim in the manner and within the reasonable time required by law.

As to ground (a) it is clear that, although the complaint and amendments do not in terms clearly allege the giving of notice and the giving thereof within a reasonable time, the case was tried without objection on the theory that the question of notice was involved, and went to the jury based on that theory. See Pre-Trial Order entered April 11, 1961, pages 8 to 9, paragraph 12 of Defendants' Contentions of Fact; pages 12 to 13, paragraph 6 of Defendants' Contentions of Law; page 6, paragraph 13 of Plain-

---

1. The rule is the same both in passing upon a motion for judgment n. o. v.—49 C.J.S. Judgments § 60b(4), p. 166—and in passing upon a motion for new trial— 66 C.J.S. New Trial § 198a, p. 478.

tiffs' Contentions of Fact. This ground, therefore, is not well taken.[2]

As to ground (b) of the last mentioned contentions—alleged failure to prove that notice was given within a reasonable time—there was sufficient evidence in the court's opinion to go to the jury and from which the jury could have found, if it believed such evidence, that the notice was given within a reasonable time. Counsel for defendants has cited many strong and persuasive authorities in which, in various types of cases, the courts have held, as a matter of law, that notice given or not given for or within a specified period, ranging from a few days to some years after the injury, was insufficient as a matter of law as not having been given in a reasonable time. However, in this particular case, the facts are, or the jury could have found from the evidence, as follows:

The hula skirt was sold on March 10, 1956, and the injury from burning of the skirt occurred on November 2, 1957. The injuries were so severe—about 75% of the skin on plaintiff's body having been severely burned, plaintiff's very life being in jeopardy for a considerable time after the injury, plaintiff being required to be isolated for a considerable period to avoid infection, and being hospitalized 17 to 18 months with numerous skin grafting and other operations—that Mrs. Leppard who bought the skirt, was not even permitted to converse with plaintiff Carol until three days before Christmas, 1957. Plaintiff Carol (born September 1, 1938) was a minor (19 years of age) when the accident occurred and even at the time suit was filed, July 2, 1959, in the State of Washington, she was still a minor under the laws of that jurisdiction. The law peculiarly favors minors, and delay on the part of her parents or others could not be used to her prejudice.[3] The aunt, Mrs. Leppard, was uncertain as to the name of the shop from which she had purchased the skirt, she not having the sales slip, and it was some time before, by correspondence, she was able to ascertain the right name of it, whereupon she took a trip to Hawaii in November, 1958, and identified the place on the ground, she having previously identified it after some uncertainty. This combination of circumstances, together with the great distances involved from British Columbia to Honolulu, the fact that the accident happened in British Columbia, Canada, a foreign country, which made it necessary for British Columbia counsel to seek advice of counsel in the State of Washington, who in turn had to seek assistance of counsel in Honolulu, plus other circumstances, would all bear on the question of reasonableness of the time within which the notice was given. It is contended that the notice itself claimed by plaintiff to have been given was insufficient, in that it allegedly failed to clearly indicate that a claim for damages would be filed. There is also a question as to when the first notice was given. It seems that when Mrs. Leppard finally identified the Around the World Gift Shop as the place where she had bought the hula skirt, she called with Mr. Anderson, one of the plaintiff's attorneys, a local lawyer, upon the then management of the shop, told them of the incident, and learned for the first time that the shop had changed hands and that the owners were no longer in Hawaii. Although there is some conflict of evidence as to what was said between Mr. Anderson and Mrs. Leppard on the one hand and the then owners of the shop on the other, and in spite of the fact that, if this constituted notice, it was not given directly to the defendants, evidence brought out in the trial showed that the then shop owners thereafter, around Christmas time, 1958, sent by mail a Christmas card to Mrs. Brown, who said she received it about January 1, 1959, and actu-

---

2. Rule 15(b), F.R.Civ.P.:
   "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."

3. 43 C.J.S. Infants § 105, p. 271; Lalakea v. Laupahoehoe Sugar Co., 1939. 35 Haw. 262, 283–285.

ally alerted the defendants at that time to the possibility of a suit. In the court's opinion, while this evidence was somewhat ambiguous, the jury could have found from it that notice was actually given and received at that time. Thereafter, Mr. John Roberts, Jr., mainland counsel for plaintiff, called personally upon the defendant Mrs. Brown on January 12, 1959, identified himself as plaintiff's lawyer, and discussed the hula skirt burning incident, mentioning a letter from Honolulu counsel to him covering the matter. On the same date, January 12, 1959, Mrs. Brown wrote to Mrs. Fink saying she had written to Home Insurance Co. about the claim, and cautioning Mrs. Fink not to talk about it in the shop.

Again there is some ambiguity as to exactly what was said by Mr. Roberts, but the court believes that sufficient evidence went to the jury from which it could reasonably have found that this action constituted notice of an intention to claim damages by reason of the alleged defective or dangerous condition of the skirt. Notice was again given by letter of June 25, 1959, received by Mrs. Brown on June 28, 1959, this time in very clear terms of the claim being made and intention to sue.

In order to show material prejudice in support of their contention as to the unreasonableness of the delay in giving notice, the defendants have relied upon the testimony of several of the defendants to the effect that certain of defendants' material books and records of the Gift Shop business had been destroyed in a fire in

October, 1958, in the home of defendants Mr. and Mrs. Brown at Topenish, Washington, where, they testified, these records had been stored. Defendants claim that if notice had been given them between the date of the hula skirt burning (November 2, 1957) and the time of the fire in defendants, Browns' home (October, 1958), they could have used those records to help prove that the hula skirt was not purchased at the Gift Shop. Although plaintiff offered no testimony attempting to disprove the foregoing testimony of defendants, it should be pointed out that plaintiff's counsel from the very outset in his opening statement and throughout the trial, including the argument to the jury, strongly contended that the defendants were not entirely frank in their testimony, and relied upon what he strongly claimed were at least evasive if not untrue statements of defendants. In this connection, by answering in the affirmative the interrogatory as to whether the hula skirt had been purchased at the Gift Shop, the jury necessarily found that defendants' contentions and evidence to the contrary were not fully believed. Thus the reasonable possibility appears that the jury may have disbelieved the defendants' testimony as to the destruction of those records by fire.

■■ Under all the foregoing circumstances, the Court rules that it cannot be said that, as a matter of law, proper notice was not given within a reasonable time, but that it was a question for the jury to decide under all the circumstances. This question was submitted to the jury by proper instructions.[4] Notwith-

---

4. Court's Instruction No. 13 reads as follows:

"In order for plaintiffs to recover on the breach of warranty cause of action, it must be shown that they gave notice to the defendants of the claimed defect and that they intended to enforce against the defendants their claim for damages for breach of warranty. Such notice must have been given within a reasonable time after the injury was sustained. What is a reasonable time is an issue for you to decide based upon all the circumstances of this case.

"Under the law, no specific form of notice is required, but it must be notice of

such character and solemnity as will reasonably put the defendants on guard and give the defendants timely information that the plaintiffs propose to look to the defendants for damages for breach of warranty.

"If you find from the evidence in this case that the plaintiffs failed to give such notice to the defendants, then the plaintiffs cannot recover on the breach of warranty cause of action.

"Such notice, however, is not required in order for plaintiffs to recover on a negligence theory of liability, if you find plaintiffs entitled to recover on such negligence theory."

standing the numerous authorities cited by defendants' counsel holding that the question of timeliness of notice was one of law under the circumstances, this court believes that, if the notice requirement of R.L.H.1955, § 202–49 is applicable, each case must be decided on its own peculiar facts, and that this was a case for the jury.[5] In this connection, it should be remembered that the defect (as found by the jury)—dangerous flammability—was a latent one which would not from its nature be known to plaintiff or the buyer until the happening of the fire which caused the injury, and hence obviously a reasonable time would have to be computed from that date rather than from the date of the sale of the skirt.[6] If, as the jury could have found from the evidence, representations were made by the sellers' saleslady at the time of sale to Mrs. Leppard, that the skirt had been treated chemically against fire, there would be even less reason for the buyer to suspect danger from the skirt. On the whole, assuming that the statutory notice requirement is applicable, the rule here adopted appears to be the more reasonable one, and the one more likely to be followed by the Hawaii courts.

However, an even better view would be that "The notice provision of the Act is inapplicable, at least where personal injuries are sustained.", and where there is no privity.[7] True, the court instructed the jury that failure to give timely notice would constitute a defense to the implied warranty cause of action, but if this was error, it was in favor of the defendants, and they cannot complain.

III. As a further ground for the motion, the defendants urged that no privity between the plaintiff and the defendants or any of them had been proven. As this is the main problem in this case, it will be considered at the end of this decision, point XVIII post.

■ IV. A further ground for the motion was a claim that, as a matter of law, the plaintiff was guilty of contributory negligence, and that this should bar recovery. The court ruled at the time, that contributory negligence would not be a defense to the claim based on implied warranty, although it would be to the claim based on negligence.[8]

■ The court now finds that any facts relied upon as constituting contributory negligence are not so clear that as a matter of law they must be held to constitute contributory negligence. Furthermore, the court holds that contributory negligence, under the generally accepted rule is not a bar to a suit based on implied warranty.[8] A persuasive argument was made by defendants' counsel to the effect that, historically, implied warranty originated in tort, that there is therefore a tendency to eliminate the requirement of privity, and that the action is now reverting more and more to the theory of tort rather than that of contract; therefore, it is contended, contributory negligence ought, by analogy, to be a defense to the implied warranty claim. It seems to the court, however, that, the doctrine of contributory negli-

5. Frumer & Friedman, Products Liability, § 19.05(2), pp. 538–539.

6. R.L.H.1955, § 202–49 requires notice "within a reasonable time after the *buyer knows or ought to know* of such breach * * *." (Emphasis added.)

7. Frumer & Friedman, supra, § 19.05(1), pp. 537–538. In La Hue v. Coca-Cola Bottling, Inc., 1957, 50 Wash.2d 645, 314 P.2d 421 the court held that the provision of their Uniform Sales Act as to notice did not apply because this was not an action *by a buyer* against a seller.
   See, also, Harper & James, Law of Torts, 1575, § 28.17, criticizing notice re-

quirement as to accident victims not "steeped in the 'business practice' which justifies the rule."

8. 12 Am.Jur. Contracts, 895, § 339; 38 Am.Jur. 853–854 § 177, 77 C.J.S. Sales § 357, note 66, p. 1266; Simmons v. Wichita Coca-Cola Bottling Co., 1957, 181 Kan. 35, 309 P.2d 633, 635; Hursh, American Law of Products Liability, § 3:9, pp. 415–419; Frumer & Friedman, Products Liability § 16.01(3), pp. 367–373.
   See, also, Prosser on Torts, 2d ed. 284, 296–299 and 341–343.

**86**

gence, which takes no account of the comparative negligence of the parties, often produces results far from equitable, and for that reason is not likely to be adopted by the Hawaii courts in its full strictness, if at all, as a complete defense in cases such as this based on breach of implied warranty, unless the contributory negligence practically amounts to an assumption of risk. See discussion of authorities cited in note 8.

On the other hand, it is reasonable to believe that the courts of Hawaii would follow the rule that the plaintiff's contributory negligence may be taken into consideration by the jury in fixing the amount of the damages in breach of implied warranty cases.[8] Defense counsel asked for an instruction making contributory negligence an absolute defense, but did not ask for a rule of comparative negligence or permitting the jury to consider the alleged contributory negligence in mitigation of damages. However, there was nothing in the court's instructions to prevent the jury from using any contributory negligence found by them in mitigation of damages.

◼ V. As a further ground for the motion the defendants urged that the plaintiff was guilty as a matter of law of assumption of risk, and defendants were relieved of liability by the principle of volenti non fit injuria. This question was submitted to the jury under proper instructions, informing them that if they found assumption of risk, it would bar not only the cause of action for negligence, but the cause of action based on implied warranty. The jury found in favor of the plaintiff, and hence must be deemed to have found that the plaintiff did not assume the risk under the circumstances. Under the facts, the question was one for the jury to determine.[9] The evidence was such that the jury could have found that the plaintiff did not know, and was not in a position where she should have known, that the skirt was so highly flammable as to constitute

an undue hazard if worn in a place where there was dancing, drinking, and cigarette smoking, of the type, and in the manner, described by the testimony. The evidence included plaintiff Carol's statement that someone had told her that the skirt was fireproof. If this testimony was believed by the jury, there would be lacking one essential element of assumption of risk, namely, knowledge of the danger.[10]

◼ VI. Another ground for the motion was that there was insufficient evidence, as a matter of law, for the jury to find that a partnership or joint venture relationship existed between the defendants Mrs. Brown and Mrs. Chase and any of the other two defendants, Mr. Brown and Mr. Chase, their respective husbands. This question was submitted to the jury under proper instructions and the jury found that Mr. Chase was not a partner or joint venturer and that Mr. Brown was. The court believes that there was sufficient evidence to go to the jury on this question. Among other things, there was testimony or evidence from which the jury could have found the following facts:

That a very substantial part, if not most, of the negotiations in connection with the opening of the business before it was finally opened, was conducted by Mr. Brown; that even after the partnership commenced business in the names of Mrs. Brown and Mrs. Chase as the sole registered general partners, Mr. Brown frequently assisted at the shop, both in waiting on customers, and in delivering orders for merchandise and receipting for such merchandise; that the moneys that were used as the Browns' share of the initial capital of the partnership came out of a joint account in the names of Mr. and Mrs. Brown, and the money received from the sale of Mrs. Brown's interest, and moneys withdrawn by Mrs. Brown from the partnership from time to time, were deposited in a joint account of Mr. and Mrs. Brown; that in corre-

8. See Note 8 on page 85.

9. Ward v. Inter-Island Steam Nav. Co., 1914, 22 Haw. 66.

10. 38 Am.Jur. Negligence, 845–846, § 171.

spondence relating to the partnership business Mr. Brown referred to himself as one of those involved, in using the pronouns "I", "we", etc. Also, as pointed out by counsel for the plaintiff in his argument to the jury, there were what could be considered as "hedging" and discrepancies in the testimony of the Browns and Chases from which the jury could also infer that the defendants were not being quite as frank as they might have been, all of which would tend to raise an adverse inference against them.[11] While the evidence as to Mr. Brown's being a partner or joint venturer was far from overwhelming, it cannot be said that, as a matter of law, it was insufficient to justify a finding by the jury of the existence of a partnership or joint venture, at least as far as Mr. Brown was concerned.

VII. In the defendants' motion at the close of plaintiff's testimony, the defendants raised the point that there is no such thing as a marital community under Hawaii law, the Hawaii Legislature having repealed the community property statute after a very brief period following its enactment.[12] This was taken care of by a ruling of the court in connection with the instructions, in which the court agreed with counsel for the defendants in this respect and limited the question submitted to the jury to that of a joint venture or partnership, or to agency. This ruling being in favor of defendants, they can suffer no prejudice therefrom.

VIII. A further contention was made that the defendants could not be liable for the acts of their wives under §§ 325–1 and 325–7, R.L.H.1955. The court had

previously held that one statute (§ 325–7) was modified by the other (§ 325–1), and that these laws must be considered in connection with other Hawaii laws emancipating women. As a result the court ruled that the liability of the husband could arise only where there was proof of the relationship of a true agency under the principle of respondeat superior. The jury were so instructed.[13] The court finds that the same evidence and circumstances which justified submission to the jury of the questions of the defendant husbands' partnership or joint venture status, vel non, justified the submission to the jury of this question as to agency vel non of the wives for their husbands.

IX. Other contentions were made by defendants in support of the motion as to the negligence claim, which need not here be decided, since the jury found in favor of the defendants on the negligence count. If any error was committed, it probably was in favor of the defendants, in the court's finally refusing to permit the jury to consider the Flammable Fabrics Act, 15 U.S.C.A. § 1191 et seq. in determining, on the merits, the question of negligence. The court has such grave misgivings as to the correctness of this ruling and the influence which the same may have had on the jury's verdict on the negligence count, that, if it were felt that the verdict as to the implied warranty could not stand, the court would feel compelled to grant a new trial on every issue, including those of whether the skirt was bought at the defendants' shop and the claim based on negligence.

X. The defendants claimed insufficiency of the proof to support the

---

11. 2 Wigmore on Evidence, 2d ed. § 278, p. 120, 31 C.J.S. Evidence § 156d, pp. 862–863.

12. See Note to Chapter 326, R.L.H.1955.

13. Court's Instruction No. 26 reads as follows:
"Section 325–7 of the Revised Laws of Hawaii 1955, insofar as it applies to the point covered by this instruction, reads as follows:
" 'The husband shall be personally responsible for all tortious acts of his wife

done by her by or with his authority or consent, and for none other.'
"The term 'tortious acts' means acts which are wrongful and proximately cause injury or damage to others.
"Under this section, a husband is not responsible for the negligent or tortious acts of his wife unless it is established that at the time such negligent or tortious acts were committed the wife was the agent, employee or partner of her husband and was acting within the scope of such relationship."

contention that the hula skirt had been represented by the defendants to have been chemically treated for flammability at time of sale; it is also claimed that there is insufficient proof to show that the skirt was flammable at the time of sale, to the point of being dangerous to an individual wearing it; and it is claimed that there is no proof that defendants knew or should have known that the skirt was flammable and highly dangerous.

These contentions are considered here in connection with their bearing on the implied warranty claim. In the court's view, there was sufficient evidence to go to the jury on the questions of whether the representation was in fact made by the saleslady at the time of sale to Mrs. Leppard that the skirt had been chemically treated against fire. Both Mrs. Leppard and Mrs. McDonald so testified in substance, and the jury could have believed them. The defendants' main defense was that none of them had made, and none of their employees had been authorized to make, any such representation, but they relied primarily on a denial that the skirt was even bought at their shop, a point on which the jury ruled against them in answering the interrogatory submitted to the jury.[14] It also appeared from the testimony of some, or one of the following witnesses—Mrs. Leppard, Mrs. Blanche Louise French (Carol's sister) and Carol—that Mrs. Leppard had spoken to Blanche before the party in relation to the skirt, and that she had also spoken to Carol; that Carol recalled that before she put the skirt on she asked if it wasn't dangerous, and that someone—she had at first thought it was Mrs. Leppard, but apparently on further thought, was not sure it was Mrs. Leppard—reassured her that it was fire-proof. Carol said she had spoken to Mrs. Leppard before the party but was not sure about what. These impressions of Carol, coupled with the positive testimony of Mrs. Leppard and Mrs. McDonald as to the representations as to treatment for flame resistance made when the skirt was purchased, plus the close family relationship shown between the Leppards, Blanche and Carol—all would support a conclusion, if the jury so interpreted the entire evidence, that in some way the original representations from the saleslady to Mrs. Leppard as to non-flammability were transmitted from Mrs. Leppard to Carol and relied upon by her. This would tend to disprove any inference that Carol knew or should have known that the skirt was dangerously flammable.

Moreover, the fact that, if the witnesses for plaintiff were believed, the skirt flared up in an explosive manner, in itself was evidence from which the jury might have inferred that a year or so previously the skirt was equally flammable, there being no evidence in the record to prove that the mere lapse of a year and a half or the events that intervened between the sale and the burning, such as the wearing of the skirt a couple of times by Mrs. Leppard and a friend to different affairs, hanging it in the trophy room for a while, and cleaning it with a vacuum cleaner, or other conditions, would substantially change the flammable qualities of the skirt, at least in the absence of expert testimony to that effect (of which there was none).

XI. Since the plaintiff withdrew the cause of action based on express warranty before the case was submitted to the jury, it is not here considered, except in so far as it has a bearing on other issues, such as negligence and implied warranty. Defendants contended that there was insufficient evidence to support the claim of implied warranty that the skirt was suitable for the special purposes for which it was purchased. This will be considered post in connection with the discussion of the privity question as it

14. Court's Instruction No. 32 required the jury to answer an interrogatory reading: "Question: Did Frances Leppard purchase the hula skirt worn by plaintiff at the time of the accident from the Around the World Gift Shop? Answer: (Answer "Yes" or "No")

bears on the claim of breach of implied warranty.

■■■ XII. Defendants claim that, as a matter of law, the skirt at the time of the alleged fire was not being used for the purposes contemplated by the buyer and seller at the time of sale. It is contended that the skirt was sold to an adult but used by a smaller person, that it was to be used by buyer for a souvenir and worn to a costume party, which was done, but that at the time of the fire the skirt was being used under circumstances not contemplated, namely in a hall where several hundred people were drinking and smoking, and where plaintiff sat down in the skirt and allowed it to touch the floor.

If these alleged differences are material, which is dubious, the question was one for the jury, and the court finds that there was at least evidence sufficient to go to the jury on this point. The evidence, including the jury's observation of Carol and Mrs. Leppard in court, would support a finding by the jury: (1) that it was or must have been known to defendants at the time of sale (a) that this hula skirt was intended to be used *as an article of clothing,* (b) that Mrs. Leppard would probably lend it to others, and (c) that it would probably be used as an article of clothing at dances, costume parties or other social gatherings, large or small, where people drank or smoked, which is a very common modern condition; and (2) considering the relative size, height, etc. of Carol and Mrs. Leppard and the length of the skirt and how it was pinned on Carol, that the wearing of the skirt by plaintiff would not constitute a different use or purpose from that contemplated at the time of sale. There is no evidence to show that the skirt, when worn by the plaintiff standing up, was any closer to the floor than it would have been if Mrs. Leppard had worn it. Moreover, even if Mrs. Leppard had worn the skirt, it is very clear that when she was in a sitting position the fibers would naturally have fallen and lain on the floor substantially in the same manner and almost, if not fully, to the same extent as when worn by the plaintiff. In this respect it can hardly be said that, as a matter of law, there was any substantial difference in degree of the risk of catching fire as between a wearing by Mrs. Leppard and a wearing by the plaintiff. The court feels that it can take judicial notice of the fact that at almost any social party or night club cigarettes are smoked by numerous people and often the butts are thrown on the floor, and sometimes not fully extinguished. As to the effect of the number of people—several hundred being present—there is no evidence that the hall was so small as to be unduly crowded by the number of people present. The fact that some of them imbibed and might have been drunk, others were "feeling good" and others sober (as shown by the deposition of one witness, Glen Siteman, pp. 20–21) would not alter the result, since there is no evidence that the inebriation of anyone actually contributed to the accident. The only evidence (including Siteman's deposition, p. 25) as to the condition of those at the table of Carol Chapman is that no one there was under the influence of liquor and that no one from the rest of the crowd was near Carol shortly before the fire. There is no evidence that the plaintiff herself had imbibed to any extent sufficient to affect her actions. Certainly the court cannot presume that it was unreasonable to contemplate that a person wearing this skirt might sit down some time during the course of an evening, so that the skirt would touch the floor.

XIII. Other contentions were made by defendants in support of their motion at the close of plaintiff's evidence, but these are believed to have applied to the negligence cause of action and are therefore not discussed. Should any of them, however, be applicable to the implied warranty cause of action, they are hereby denied and overruled as grounds for the motion for judgment n. o. v.

■■■ XIV. A further contention was made that the case should be dismissed as to the plaintiffs Ruby and Cecil Chapman, parents of plaintiff Carol, they claiming medical expenses. This matter

**90**

was settled, it seems to the court, by the concession of the plaintiffs, expressed through their counsel, that the amount of the damages would not be increased or decreased by reason of the parents' being or not being in the picture as plaintiffs, and the court has so ruled, it appearing that Carol had assumed all expenses upon her becoming an adult and had agreed to pay all of the same. It is probable that the parents were responsible, while she was a minor, for any expenses incurred by her or in her behalf, but the minor also could be held responsible for the same, as necessaries. Defendants suffered no prejudice by the joinder of Carol's parents as co-plaintiffs, and the motion is denied as to this ground.

XV. The next point urged was that expenses paid by the Government of the Province of British Columbia for hospitalization of the plaintiff, and which she did not have to repay, should be excluded from the jury's consideration as to damages. The court ruled, and reiterates that ruling, that the plaintiff is nevertheless entitled to recover the reasonable value of these hospitalization expenses and services.[15]

As stated ante,[16] the foregoing are the grounds urged by defendants in support of their first *motion to dismiss,* or for a directed verdict, made when the plaintiffs rested and before the defendants commenced their case; these grounds were repeated and incorporated by reference in defendants' *motion for a directed verdict* made after both parties had rested and before the case was submitted to the jury; and the *motion for judgment n. o. v.* incorporated by reference all of those grounds, except the next point, No. XVI, hereinafter discuss-

ed, and the one based on lack of privity, which will be taken up at the end of this decision, point No. XVIII post.

XVI. The defendants contend that this action is barred by the statute of limitations.

The hula skirt was purchased in Honolulu, Hawaii, on March 10, 1956. The injury occurred to plaintiff in British Columbia, Canada, on November 2, 1957. Action was commenced in the United States District Court for the Eastern District of Washington, Northern Division, on July 2, 1959, which was 3 years, 3 months and 22 days after the date of purchase and 1 year and 8 months after the injury occurred. The action was transferred to this District prior to trial.

The statute of limitations of the State of Washington is 3 years for injury to the person and for the breach of an implied warranty not arising out of a written instrument.[17] There are two statutes of limitations of the State of Hawaii which might be considered as applying to this type of action: 6 years for the recovery of a debt founded upon a contract, obligation or liability [18] and 2 years for injury to the person.[19]

It is not necessary for the court to decide whether the statute of limitations of the State of Washington or of the State of Hawaii applies in this case, if the latter, which statute applies, or whether the applicable statute commenced to run against the plaintiff at the time of the purchase or at the time of the injury, because, since plaintiff was only 20 years of age when this action was commenced,[20] even if the statute of limitations started to run at the time of purchase, she is not barred by the Wash-

---

15. Landon v. United States, 2 Cir., 1952, 197 F.2d 128, 129; James, Law of Torts, Vol. 2, pp. 1343–1354 and notes in 18 A.L.R. 678, 680, 681, 95 A.L.R. 575 and 128 A.L.R. 686, 687; Reichle v. Hazie, 22 Cal.App.2d 543, 71 P.2d 849; Standard Oil Co. of California v. United States, 9 Cir., 1946, 153 F.2d 958, 963; Rayfield v. Lawrence, 4 Cir., 1958, 253 F.2d 209, 212–213.

16. At page 82 of this decision.

17. Revised Code of Washington, Section 4.16.010 and Section 4.16.080(2) and (3).

18. R.L.H.1955, § 241–1.

19. R.L.H.1955, § 241–7.

20. At page 83 of this decision.

ington statute,[21] or by the Hawaii 2-year statute [22] and, if the Hawaii 6-year statute is applicable, the action was filed in time in any event.

### The Motion for a New Trial

XVII. The foregoing disposes of all grounds in the motion for judgment n. o. v., except the problem of privity, disposed of post. The court will now take up the alternative motion for a new trial. At the outset, it is noted that defendants request a new trial not only on the issues of whether there was a breach of an implied warranty and related questions, but also on the questions of whether the hula skirt was purchased at the Around the World Gift Shop, and whether Mr. Brown was a partner or joint venturer in the business known as Around the World Gift Shop, yet they refrain from asking for a new trial also on the negligence cause of action and on the question of whether Mr. Chase was also such a partner. If the reason for not asking for a new trial on the negligence claim is that it is considered res judicata, it would seem somewhat inconsistent not similarly to consider as res judicata the finding of the jury on the interrogatory submitted to them that the skirt was purchased at this Gift Shop, and their finding that Mr. Brown was a partner. In the court's view, if a new trial is to be granted, it should be de novo, not only on those issues mentioned in the motion for a new trial, but on all other issues, including the negligence claim.

However, this court believes, and so rules, that the motion for a new trial should be denied, for the reasons hereinbefore and hereinafter stated. The court will now take up the various grounds specifically set forth in the motion for a new trial, in the order, and with the numbering appearing therein.

*Grounds 1 to 4* claiming that the verdict is contrary to law, and contrary to the evidence, and that the evidence is insufficient to justify or support any verdict for plaintiffs, are general grounds, disposed of by rulings set forth ante, and hereinafter, upon specific points.

*Grounds Nos. 5, 6, 7, 8, and 9* (Timeliness of notice; statute of limitations; privity; claiming contributory negligence, and assumption of risk) are disposed of in points II, XVI, XVIII, IV, and V, respectively, of this decision.

*Ground No. 10* claims error in the court's denial of defendants' pre-trial motion to dismiss the action or in the alternative to exclude Mr. Anderson and his firm from further participation in the case. This is sufficiently covered by the court's decision rendered on April 5, 1961 (Reference No. 103 in the court file).

*Ground No. 11* urges that the court erred in denying defendants' motion for a mistrial and for the discharge of the jury panel made during the *voir dire* examination of the jury panel. As the court recalls it, defendants' counsel made a motion for a mistrial after one prospective juror had said he was convinced that all hula skirts should be treated to be fire resistant. This juror was excused and the court satisfied itself by inquiry that the jurors would not be influenced to the detriment of defendants. This ground is denied.

*Ground No. 12* claims the court erred in making its ruling prohibiting inquiry of plaintiff Carol Lee Chapman during

---

21. Revised Code of Washington, § 4.16.-190 provides as follows:
   "If a person entitled to bring an action mentioned in this chapter * * * be at the time the cause of action accrued under the age of twenty-one years, * * * the time of such disability shall not be a part of the time limited for the commencement of action."

22. In 1957, R.L.H.1955, § 241–12, reading as follows, was made applicable to R.L.H. 1955, § 241–7: "If any person entitled to bring any action specified in this part * * * is, at the time the cause of action accrued, either, (a) Within the age of twenty years; or, * * * Such persons shall be at liberty to bring such actions within the respective times limited in this part, after such disability is removed."

her pre-trial discovery deposition or during the trial concerning alleged admissions made to one Scotty Friend. This statement and the various affidavits relating to the same are found in the file (reference numbers 86 to 89 inclusive). After argument the court ruled that it would exclude all evidence of Mr. Scotty Friend or relating thereto. A reading of the statement of Scotty Friend in the file would indicate clearly that it contained nothing that could substantially affect the merits of the case. The court finds no error in this connection.

■ *Ground No. 13* claims error in denying portions of defendants' motion to produce documents for inspection and copying. The record and court's recollection are not entirely clear as to the exact action taken on the motion to produce for inspection and copying filed by defendants' attorneys April 11, 1961, and no order was filed of record setting forth the court's final action thereon. However, an inspection of the motion and the supporting affidavits will indicate that they failed to comply with the requirements of Rule 34, F.R.Civ.P. in that they failed to show the actual existence of any documents, the discovery of which was sought, and good cause for such production. Further, the court's recollection is that, except for documents which were, in fact, ultimately produced by plaintiff's attorneys to the defendants' counsel, there was a denial by plaintiff's counsel as to the existence of the alleged correspondence and documents, of which discovery was sought. The court believes this ground not well taken.

*Ground No. 14* claimed error in admitting plaintiff's Exhibit No. P–20 (drawings of Waikiki building). In the context of the evidence, these were properly admitted as bearing upon the question whether Mr. Brown was a partner with Mrs. Brown and Mrs. Chase, as well as upon the question of credibility of the defendants or some of them.

■ *Ground No. 15,* claiming error in permitting plaintiff's counsel to question defendant Mrs. Brown over defendants' objection with regard to letter dated January 12, 1961, is not well taken. This letter had a legitimate and material bearing upon the questions of credibility of the defendant Mrs. Brown and the adequacy and timeliness of notice which was given of the claimed dangerous condition of the skirt and plaintiff's intention to claim damages. In this connection, the court allowed defendants' counsel, over plaintiff's objection, to bring out by further questioning from the same witness the fact that the insurer, Home Insurance Company, was denying liability, in order to counteract any implication to the jury that the defendants were fully and safely insured, and then the court adequately instructed the jury to disregard insurance or lack of it in determining the merits of the case, and strictly limited the purposes for which the letter and testimony covering same were to be used.

The foregoing paragraph also disposes of *Ground No. 16* as to alleged error in denying defendants' motion for a mistrial based on the same point. See Court's Instruction No. 31.[23]

23. Court's Instruction No. 31:
"During the last day of taking testimony the court instructed you to disregard any testimony as to insurance coverage or lack of it except insofar as it might have a bearing upon credibility. Let me elaborate on that and add to it as follows:
"First: The question of whether a defendant has or has not insurance coverage is absolutely immaterial to the issue of whether such a defendant is liable or is not liable to the plaintiff. On such an issue of whether or not the defendant is liable, you should entirely disregard such testimony of insurance coverage or lack of it. In order to find a defendant liable to the plaintiff you must find that the plaintiff has proved by a preponderance of the evidence that the defendant is so liable, independent of any question of insurance coverage. And if the plaintiff had failed to prove such a liability by a preponderance of such independent evidence, then a defendant cannot be found liable just because he may have insurance coverage, if he has such coverage.
"On the other hand if a plaintiff does prove by a preponderance of the evidence that a defendant is liable, the amount of

*Ground No. 17,* claiming error in denying the defendants' motion for a directed verdict at the close of plaintiff's evidence and the renewed motion at the close of all the evidence, is disposed of adversely to defendants in the other rulings herein disposing of various grounds urged in support of the motions for judgment n. o. v. and for a new trial.

*Ground No. 18,* claims error in the court's giving the following instructions, using the court's numbering of the instructions as finally given:

(a) *Court's Instruction No. 12.*[24] The defendants claim that this instruction was erroneous because (1) privity is required for recovery on the claim of breach of implied warranty, and no privity was shown here, and there was failure of proof sufficient to justify submitting the issues to the jury of (2) whether or not the skirt was reasonably fit for the purposes for which it was sold, and (3) whether the garment was dangerously inflammable and defective; and (4) there was a failure to give notice within a reasonable time as a matter of law, hence the issue should not have been submitted. These grounds are disposed of by the court's specific rulings thereon elsewhere in this decision: see points Nos. II, X, ante and XVIII post.

(b): *Court's Instruction No. 13.*[25] It was claimed that the court should have decided that, as a matter of law, the plaintiff had not given notice within a reasonable time, and further that reasonable notice was required even on the negligence cause of action, defendants claiming that the Sales Act had pre-empted the field. This objection, as to the implied warranty cause of action, is also disposed of adversely to defendants by the court's ruling on point II, ante. Of course, the objection is moot, so far as the negligence cause of action is concerned, since the jury decided that claim adversely to the plaintiffs.

damages which the plaintiff is entitled to recover cannot be increased or diminished or influenced in any way by the fact, if it be a fact, of coverage or non-coverage of the defendant by insurance. You must therefore entirely disregard such testimony for any purpose except as it might have a bearing upon the credibility of a witness or witnesses or upon the issue of whether notice of alleged breach of implied warranty and of intention to claim damages therefor was given within a reasonable time."

See, also, Carr v. Kinney, 1955, 41 Haw. 166 and Choy v. Otaguro, 1932, 32 Haw. 543. Although these two Hawaiian decisions dealt with examination of jurors on their *voir dire,* the reasoning thereof is applicable to the present situation in which the fact that insurance was mentioned therein was held not to render inadmissible a letter which was admissible to prove a material point.

24. Court's Instruction No. 12.
"One of the causes of action brought by the plaintiffs is based upon a claimed breach of an implied warranty that the hula skirt worn by the plaintiff Carol Lee Chapman was reasonably fit for the purpose for which it was sold. The breach alleged is that the garment was dangerously inflammable and explosive.

"It is not necessary, therefore, for plaintiffs' recovery to establish that any express warranty was made."

25. Court's Instruction No. 13.
"In order for plaintiffs to recover on the breach of warranty cause of action, it must be shown that they gave notice to the defendants of the claimed defect and that they intended to enforce against the defendants their claim for damages for breach of warranty. Such notice must have been given within a reasonable time after the injury was sustained. What is a reasonable time is an issue for you to decide based upon all the circumstances of this case.

"Under the law, no specific form of notice is required, but it must be notice of such character and solemnity as will reasonably put the defendants on guard and give the defendants timely information that the plaintiffs propose to look to the defendants for damages for breach of warranty.

"If you find from the evidence in this case that the plaintiffs failed to give such notice to the defendants, then the plaintiffs cannot recover on the breach of warranty cause of action.

"Such notice, however, is not required in order for plaintiffs to recover on a negligence theory of liability, if you find plaintiffs entitled to recover on such negligence theory."

(c): *Court's Instruction No. 14.*[26] This was objected to on the ground that there was a failure of proof to support any claim of implied warranty or any breach thereof; that no privity had been proved, and that the court should rule as a matter of law that notice had not been given within a reasonable time. This is disposed of adversely to defendants by other rulings in this decision on these specific points: see points Nos. II and X ante, and XVIII post. The court believes that this instruction was proper under the peculiar facts of this case. This is a case in which, although the latter was not specifically mentioned during the trial, there were both an implied warranty as to quality and fitness for use, and an implied warranty of merchantability, which were identical as to fitness of the skirt for use *as an article of clothing*. It is the court's firm belief that any article of clothing, such as a hula skirt, which is so highly flammable as to be dangerous to life and limb, is defective and unsuitable for the use for which it was sold, and selling the same would be a breach of both implied warranties of quality and fitness, and merchantability.[27]

(d): *Court's Instruction No. 14a*[28] was objected to upon the same grounds as those with respect to the Court's Instruction No. 14, which are disposed of above. Also the words of this instruction stating that the warranty included a warranty that the article was reasonably fit and safe "for any purpose the seller might reasonably anticipate it will be used," were objected to as being too broad. The court believes that these words were proper in the context of the particular facts of this case in which in effect identical warranties of fitness and merchantability for use as an article of clothing could justifiably be implied. The only intended and actual use which could affect the jurors' judgment shown by the evidence in this case was that of *an article of clothing,* hence no substantial prejudice was suffered by the defendants, even if, as a general proposition, the language objected to would be too broad. In this connection, it is to be noted that the uncontradicted evidence is to the effect that the skirt flared up with extreme rapidity and in an explosive manner. It is also claimed that the last sentence of this instruction was erroneous in removing from the jury the question of the standard in the community. The court believes that the fact, if it be a fact (there being some conflict, in the light of Mr. Billam-Walker's evidence, as to what really was the standard in the commu-

26. Court's Instruction No. 14.
"You are instructed that when a buyer expressly or by implication makes known to a seller the particular purpose for which the goods are required and it appears that the buyer relies on the seller's skill and judgment, there is an implied warranty on the part of the seller that the goods should be reasonably fit for such purpose.
"The material portion of the Hawaii statute applicable to the claim of plaintiff based on alleged breach of implied warranty reads as follows:
" 'Subject to the provisions of this chapter and of any statute in that behalf, there is no implied warranty or condition as to quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:
" 'Where the buyer expressly or by implication makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, there is an implied warranty that the goods shall be reasonably fit for such purpose.'

27. See Frumer & Friedman, Prod.Liab. § 19.03(1) to (3), pp. 503-514.

28. Court's Instruction No. 14a:
"You are instructed that a storekeeper does not guarantee or warrant that an article of clothing, such as a hula skirt, sold by him in the usual course of business, will not ignite if exposed to fire. He warrants that the article is reasonably fit and safe for the ordinary uses and purposes for which it is designed and sold, or for any purpose the seller might reasonably anticipate it will be used. But if when sold, it is an article that, because of its inherent quality or characteristic, will ignite and burn so rapidly and in such a dangerous manner as to seriously jeopardize the life or limb of the wearer, then, because of such dangerous quality or characteristic, it is not suitable for use as wearing apparel."

nity), that other storekeepers sold similar merchandise at the time, even if relevant,[29] would not prove that the hula skirt was not defective and dangerously flammable, so as to relieve these particular defendants from liability for selling an article so imminently dangerous to life and limb of the wearer as the jury evidently found this skirt to be, and the evidence appeared to indicate, without warning, particularly in the light of the Federal Flammable Fabrics Act which applied in 1956 to intra-territorial sales.

■ (e): *Court's Instruction No. 14b* [30] was objected to on the ground that it is too broad, as in the case of No. 14a. The court believes that this instruction was justified on the same grounds as No. 14a.

(f): *Court's Instruction No. 19* [31] claims error in the court's limiting the defense of contributory negligence to the negligence claim only, it being contended that, if privity is dispensed with, then implied warranty should sound in tort and contributory negligence should then be available as a complete defense. This point has been fully covered in the court's decision under point No. IV ante.

(g): *Court's Instruction No. 23* [32] is objected to because it limits the defense of contributory negligence only to the plaintiff's negligence claim. This objection in essence is the same as that to Court's Instruction No. 19, and is overruled on the same grounds.

However, even as to the negligence cause of action the evidence bearing upon whether Carol was in any degree under the influence of liquor was so tenuous that there is serious question whether the court should even have submitted the question to the jury as a possible defense.

■ (h): *Court's Instruction No. 24.* [33] This was objected to on the ground that it permitted the jury to consider the

29. See 2 Wigmore on Ev., 3d ed. § 381.

30. Court's Instruction No. 14b.
"It is for you the jury to determine, from all the evidence, whether the use of the skirt by the plaintiff, Carol Lee Chapman, and the manner in which and the circumstances under which it was being used by her, at the time of the fire which injured her, was a use which the seller should reasonably have anticipated at the time of sale, or whether it was such an unusual use that it was not reasonably foreseeable by the seller at the time of sale."

31. Court's Instruction No. 19.
"In addition to denying that any negligence of the defendants proximately caused any injury to the plaintiff, the defendants allege by way of affirmative defense that contributory negligence on the part of the plaintiff was a proximate cause of any injury which the plaintiff may have sustained.
"Contributory negligence is negligence on the part of a person injured which, cooperating in some degree with the negligence of another, helps in proximately causing the injury. In a cause of action based on negligence of a defendant, the plaintiff cannot recover damages from the defendant if the plaintiff was guilty of contributory negligence, even if the defendant was negligent.

"The burden is on the defendants alleging the affirmative defense of contributory negligence to prove, by a preponderance of all the evidence in the case, the claim that the plaintiff was negligent and that such negligence was a proximate cause of any injury which the plaintiff may have sustained."

32. Court's Instruction No. 23.
"If you find that at the time said skirt is alleged to have caught fire plaintiff Carol Lee Chapman was under the influence of or affected by the consumption of intoxicating liquor and that she thereby failed to exercise that degree of care for her own safety which a reasonably prudent and sober person would have exercised under the same or similar circumstances, and if you find such failure to exercise care contributed to any injury she may have received, then said plaintiff would be guilty of contributory negligence and could not recover against the defendants under the cause of action based on negligence."

33. Court's Instruction No. 24.
"You have heard some mention of the Flammable Fabrics Act in this case. That is an Act of Congress which was applicable to sales of fabrics and wearing apparel in the Territory of Hawaii when the sale of the hula skirt here involved was made, but the Court has determined

Federal Flammable Fabrics Act insofar as knowledge or lack of knowledge of the same by a shopkeeper would have a bearing upon the question of due care or credibility of a party or witness. Inasmuch as the Act was an act of Congress made particularly applicable to intra-territorial sales of articles of clothing, and was approved June 30, 1953, to take effect July 1, 1954, a year and eight months before the sale in question, and was largely publicized by the Better Business Bureau through Donald Billam-Walker, as testified to by him, among Waikiki merchants, particularly engaged in the sale of flammable clothing, including a representative of Mrs. Kam, defendants' principal supplier of hula skirts, although there is no testimony that he actually contacted the Around the World Gift Shop people, it seems to this court that the defendants, being merchants, had a duty to keep up with developments in the clothing field, such as the Flammable Fabrics Act. If they didn't know about the Act, this could be argued to the jury along with other evidence, as reflecting a lack of due care on the part of defendants in selling articles of clothing without keeping up with the laws and regulations applicable to their business which, if known, should have alerted them as to the possible flam-

mability of their stock, and it would certainly reflect on the qualifications of witnesses such as Mrs. Kam, called by the defendants as an expert, who testified that she did not know about the Flammable Fabrics Act until some time after this accident.

Insofar as the due care aspect is concerned, this might be moot because of the jury's verdict in favor of the defendants on the negligence claim. However, the court was extremely dubious about this instruction at the time, and believes that, if it committed error, the error was in favor of the defendants rather than against them in preventing the jury from considering the Flammable Fabrics Act more fully on the merits of the negligence claim.

(i): *Court's Instruction No. 24a,*[34] concerning agency was germane to the question of whether the wives were acting as agents of their husbands in conducting the business of the Around the World Gift Shop and selling the skirt. It is contended that there was a failure of proof as to the agency of the wives for the husbands. This is disposed of by the court's ruling on point No. VIII ante.

(j): *Court's Instruction No. 25*[35] is objected to on the ground that the court

as a matter of law that under the evidence in this case the Act cannot provide a basis for recovery by the plaintiff against the defendants or any of them. You may, however, consider whether knowledge or lack of knowledge of the Act by a shopkeeper, wholesaler or expert witness would or would not, along with other circumstance, have a bearing upon the question of due care or credibility of a party or witness."

34. Court's Instruction No. 24a:
"An agent is a person who, by virtue of and pursuant to an agreement with another called the principal, undertakes to represent the principal in dealings with third persons, or undertakes to transact some other business, to manage some affair or to perform some service for the principal, whether for compensation or gratuitously. The agreement may be oral, written, express or implied."

35. Court's Instruction No. 25: "Defendants Charles E. Brown and Merle D.

Chase have been sued on the theory that each of the men was a principal for whom their respective wives, the defendants Edith L. Brown and Helen Chase, were acting as agents within the scope of their authority at the time of the alleged sale of the hula skirt, or alternatively, that they were partners with their wives in the operations of the Around the World Gift Shop. Whether the facts support either of these theories or issues is a matter that you must decide from the evidence in the case, inasmuch as plaintiffs' contentions have in this respect been denied.

"If you find that the hula skirt was not purchased at the Around the World Gift Shop, it becomes unnecessary to consider the question of agency or partnership.

"If, however, you find that the skirt was purchased at Around the World Gift Shop and that defendants Edith L. Brown and Helen Chase are liable, then you must decide whether these ladies or ei-

should have ruled as a matter of law on the evidence that the male defendants were not partners or principals of or with their wives, and that there was insufficient proof to justify submitting this question to the jury. This objection is answered by the court's decision ante under point No. VI.

(k): *Court's Instruction No. 27* [36] was objected to on the ground that there was a failure of proof that any damage sustained by the plaintiff was the proximate result of the breach of implied warranty or negligence of the defendants. This is disposed of by other rulings of the court ante.

*Ground No. 19* claims error in the court's refusal to give the following instructions requested by defendants: Nos. 1, 7, 10, 12, 13, 16, 17, 20, 21, 22, 24, 25, and 27. These instructions are not quoted because of the already undue length of this decision. They were refused, either because, in the court's view, they were covered by other instructions, or because they were not sound as a matter of law or were not justified by the evidence.

---

ther of them were acting as agents for their husbands within the scope of their authority and/or whether either or both of these men were in partnership with their wives.

"If you find that the defendant wives were not agents of their husbands at the time of the sale of the hula skirt and you further find that the defendants Charles E. Brown and Merle D. Chase were not partners with their wives in the operation of the Gift Shop, then your verdict shall be for the defendants Charles E. Brown and Merle D. Chase.

"If you find that only one of the male defendants was an agent and/or a partner, but the other was not, your verdict should be in favor of the male defendant you find not to be an agent and/or a partner. If you find that the defendants Edith L. Brown and Helen Chase, are liable and either that they were agents for their husbands at the time of the sale of the hula skirt or that the defendants Charles E. Brown and Merle D. Chase were partners with their wives in the operation of Around the World Gift Shop, then your verdict will be in favor of the plaintiffs against all the defendants."

36. Court's Instruction No. 27:
"If, under the court's instructions, you should find that plaintiffs are entitled to a verdict on one or more of their causes of action, you shall make a single damage award for all plaintiffs. In arriving at the amount of the award, you shall determine each of the items of claimed damage which I now am about to mention, provided that you find them to have been suffered by plaintiffs and as a proximate result of the defendants' negligence and/or breach of implied warranty.

"The reasonable value of the examinations, attention and care by physicians and surgeons reasonably required and actually given in the treatment of the plaintiff Carol Lee Chapman; and reasonably certain to be required and to be given in her future treatment, if any.

"The reasonable value of services of nurses, attendants, hospital accommodations, reasonably required and actually given in the treatment of plaintiff Carol Lee Chapman; and reasonably certain to be required and to be given in her future treatment if any.

"The reasonable value of the lost time from employment by said plaintiff Carol Lee Chapman since her injury up to the present time and during which she has been unable to pursue an occupation. In determining this amount, you should consider evidence of plaintiff's earning capacity and the manner in which she ordinarily occupied her time before the injury, and find what she was reasonably certain to have earned in the time lost had she not been disabled.

"If you should find that plaintiff Carol Lee Chapman's power to earn money has been so impaired by the injury in question that she will suffer a pecuniary loss in the future from that impairment, then you will award her such sum as will compensate her reasonably for any such future detriment as she is reasonably certain to suffer.

"In fixing this amount you may consider what said plaintiff Carol Lee Chapman's health, physical ability and earning power were before the accident and what they are now, the nature and extent of her injuries, whether or not they are reasonably certain to be permanent, all to the end of determining the effect of her injuries upon her future earning capacity and the present value of the loss so suffered."

Ground No. 20 alleged error in denying defendants' motion for a mistrial and to discharge the jury, made Saturday morning, April 29, 1961, after the jury reported itself deadlocked. In view of the length of this trial and the complexity of the evidence and points involved, the court does not believe that the jury had been out an unduly long time from late afternoon Wednesday, April 26, to Saturday morning, April 29, 1961, especially since the jury had been permitted to go home at night on each day of deliberation and return at 9:00 a. m. or 10:00 a. m. the next morning.

Moreover, as it eventually turned out, what the jury really meant was that they were deadlocked on the negligence claim, and not on the implied warranty one, for the dates of the special verdicts indicate that the jury had reached unanimous agreement on the interrogatory and on the implied warranty claim prior to Saturday, April 29. It would have been proper, if so instructed in the court's discretion, for the jury to report its finding on the interrogatory and special verdict on the implied warranty cause of action separately. Hence defendants cannot complain of the court's action which resulted finally in a verdict in their favor on the negligence claim, the only one on which the jury was in disagreement at the time they so reported to the court.

Ground No. 21 alleges misconduct of plaintiff's counsel in arguing and discussing the possible existence of insurance during the final argument. The court believes that there was a legitimate reason for counsel to advert to the letter mentioning insurance sent by Mrs.

Brown, on questions of credibility, and that the court's instructions at the time and the formal instruction [37] to the jury were warranted, and that defendants were not prejudiced by this action and/or instruction.

## Privity

XVIII. This point is considered the crux of this case, namely, whether by the law of the State of Hawaii, privity is required in order for a person other than the immediate buyer, injured by a defective or dangerous product, to recover from the retailer or seller of that product. This being a diversity case based on breach of an implied warranty claimed to have been made in Hawaii, the law of Hawaii applies.[38] Here there is no Hawaii decision clearly setting forth the rule by which we are to be guided, and hence this court must guess at what the Hawaii Supreme Court would decide in a similar case.[39]

We start here with a finding of the jury, based upon sufficient evidence to justify the same, that at the time of the sale of the skirt to Mrs. Leppard, plaintiff's aunt by marriage, the seller impliedly warranted that the hula skirt was reasonably fit for use as an article of clothing, and that there was a breach of such warranty. Under instructions of the court which in effect dispensed with any requirement of "privity" between the plaintiff and defendants, the jury found the defendants liable to plaintiff for such breach and brought in a verdict in a very substantial amount. Was the court correct in holding that such privity was not required in this case?

37. Instruction No. 31, quoted in Note 23 ante.

38. Erie Railroad Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188; Texas Motorcoaches, Inc. v. A. C. F. Motors Co., 3 Cir., 1946, 154 F.2d 91, 93; Francis de Flanchet, 1858, 2 Haw. 96, 109.

39. If there is no State Court decision, the Federal Court must attempt to determine what the State Courts would decide. McAfee v. Cargill, Inc., D.C.Cal.1954, 121

F.Supp. 5. Mutual Ben. Health & Accident Ass'n v. Cohen, 8 Cir., 1952, 194 F.2d 232, 241.

In the absence of a decision by a court whose judgment is authoritative on a court trying a case, a judge must exercise his best judgment on legal questions submitted to him in accordance with his own views, although other courts have reached a contrary conclusion. 21 C.J.S. Courts § 186, p. 297. United States v. Hopkins, D.C.Ohio 1951, 95 F.Supp. 14, 17.

Defendants, pointing to the Uniform Sales Act which was adopted in Hawaii in 1929, and what they claim is the majority or common law rule, contend that the court erred and that the verdict cannot stand and must be set aside because of lack of such privity. If defendants' contention is correct, this is a defect which could not be expected to be cured by any evidence on a new trial, and hence would require judgment n. o. v. to be entered in favor of the defendants, on the cause of action based on implied warranty.[40] Although a strong technical argument is made out by the defendants in this connection, this court is still persuaded that the countervailing arguments and equities are so strong that they may be expected to be adopted by the Hawaii Supreme Court when occasion arises.

The defendants also cite the Committee Reports of both Houses of the Legislature at the Session which passed Hawaii's Uniform Sales Act,[41] as supporting their contention that the Act adopts the alleged majority or common law rule on privity.

The defendants' argument commenced with § 202-15(a), R.L.H.1955 (of the Hawaii Uniform Sales Act) quoted in the margin.[42] Other relevant portions of the Act, including § 202-15(b), relating to implied warranty of merchantability, are also quoted in the margin.[42]

40. 2 Barron & Holtzoff, F.Prac. & Proc. § 1079.

41. That Act was originally House Bill 288 of the 1929 Session and became Act 189 Session Laws of Hawaii 1929, and is now found in Chapter 202 R.L.H.1955. Its title was "An Act to Make Uniform the Law of Sales." It was approved and took effect May 1, 1929. The Judiciary Committee of the Hawaii House of Representatives reported as follows on the bill:

"The purpose of this Bill is to make uniform the law of sales. Its provisions do not make any material change in the common law relating to sales.

"The bill is one of a series of bills introduced at the suggestion of the commission on uniform legislation, and met no objection at a public hearing called for the purpose of considering it." H.J. 1929, pp. 926-927.

The Senate Judiciary Committee reported on the same bill as follows:

"This Bill is the Uniform Sales Act drafted and drawn by the National Commission on Uniform Laws for the United States, endorsed and adopted by the American Bar Association and submitted and recommended to this Legislature by the Commission on Uniform Laws for the Territory of Hawaii. The Act has been adopted by over forty states and is now in force, as law, therein. It embodies the common law of sales and is declaratory thereof. Your Committee feels that the purposes of the Bill are very commendatory and it is desirable that the law of sales be made uniform in this jurisdiction to conform to the law of the majority of the jurisdictions on the mainland." S.J.1929, p. 1139.

42. R.L.H.1955, § 202-75(a) provides: "'Buyer' means a person who buys or agrees to buy goods or any legal successor in interest of such person". § 202-15 provides:

"Subject to the provisions of this chapter and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"(a) Where the *buyer*, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an *implied warranty* that the goods shall be *reasonably fit for such purpose;*

"(b) *Where the goods are bought by description from a seller who deals in goods of that description* (whether he be the grower or manufacturer or not), there is an *implied warranty* that the goods shall be of *merchantable quality;* * * *." (Emphasis added.)

§ 202-49 provides as to notice:

"Acceptance does not bar action for damages. In the absence of express or implied agreement of the parties, acceptance of the goods by the buyer shall not discharge the seller from liability in damages or other legal remedy for breach of any promise or warranty in the contract to sell or the sale. But, if, after acceptance of the goods, the *buyer* fails to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows or ought to know of such breach, the

Defendants contend that the terms of the Uniform Sales Act itself, as well as the above-cited history of that particular legislation in Hawaii, plus what is now R.L.H.1955, § 1–1, adopting the common law [43] require a holding that the Act is exclusive, pre-empts the field of implied warranty and adopts what is claimed to be the majority or common law rule limiting the remedy for breach of implied warranty to the immediate buyer, or at most to those in strict privity with the seller. It is assumed, for the purposes of this decision, that, to the extent that the Hawaii Uniform Sales Act is applicable, that law controls. However, for reasons hereinafter stated, this court disagrees with the contention as to the proper coverage and interpretation of that Act, even in the light of what is said by the legislative committees and R.L.H.1955, § 1–1, cited supra.

It is unfortunate that, so far as our research discloses, with but one exception,[44] the courts which have written recent landmark decisions [45] departing from the requirement of privity in implied warranty cases—and upon the general reasoning of which the modern trend followed in this decision is largely based —have not clearly and expressly indicated how they reconciled their decisions with the provisions of the Uniform Sales Act in their respective jurisdictions, more particularly the section relating to implied warranties, which, in Hawaii, is R.L.H.1955, § 202–15, quoted supra. Had they done so, the task of writing this opinion might have been much easier.

It is true that, after its origin in 1842 in Winterbottom v. Wright,[46] the requirement of privity was adopted by numerous courts without critical examination of its appropriateness with respect either

seller shall not be liable therefor." (Emphasis added.)

§ 202–69 as to remedies for breach of warranty, provides, under that heading:

"(a) Where there is a breach of warranty by the seller, the *buyer* may, at his election:

"(1) Accept or keep the goods and set up against the seller, the breach of warranty by way of recoupment in diminution or extinction of the price; (2) *accept or keep the goods and maintain an action against the seller for damages* for the breach of warranty; * * *.

"(f) The measure of damages for breach of warranty *is the loss directly and naturally resulting, in the ordinary course of events, from the breach of warranty.*" (Emphasis added.)

"§ 202–70. Interest and special damages. Nothing in this chapter shall affect the right of the *buyer* or seller to recover interest or special damages in any case where by law interest or special damages may be recoverable, * * *." (Emphasis added.)

"Sec. 202–73. *Rule for cases not provided for by this chapter.* In any case not provided for in this chapter, the *rules of law and equity,* including the law merchant, and in particular the rules relating to the law of principal and agent and to the effect of fraud, misrepresentation, duress or coercion, mistake, bankruptcy, or other invalidating cause, *shall*

*continue to apply to contracts to sell and to sales of goods."*

43. "§ 1–1 Common law of Territory; exceptions. The common law of England, as ascertained by English and American decisions, is declared to be the common law of the Territory of Hawaii in all cases, except as otherwise expressly provided by the Constitution or laws of the United States, or by the laws of the Territory, or fixed by Hawaiian judicial precedent, or established by Hawaiian usage; provided, that no person shall be subject to criminal proceedings except as provided by the written laws of the United States or of the Territory."

44. See Klein v. Duchess Sandwich Co., 1939, 14 Cal.2d 272, 93 P.2d 799, discussed post, and Note No. 61 post.

45. See Henningsen v. Bloomfield Motors, Inc., 1960, 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1; Martin v. J. C. Penney Co., 1957, 50 Wash.2d 560, 313 P.2d 689; Hector Supply Co. v. Carter, Fla. App.1960, 122 So.2d 22; Diamond Alkali Co. v. Godwin, 1959, 100 Ga.App. 799, 112 S.E.2d 365, affirmed in op. not reaching this point 215 Ga. 839, 114 S.E.2d 40; Spence v. Three Rivers Builders & Masonry Supply, Inc., 1958, 353 Mich. 120, 90 N.W.2d 873; Bowles v. Zimmer Mfg. Co., 7 Cir., 1960, 277 F.2d 868, 76 A.L.R.2d 120.

46. 10 Mees & W. 109, 152 Eng.Reprint 402.

to negligence cases or to implied warranty cases of the nature here involved—so much so as to be regarded as the "common law rule" until recently.[47] However, with the development of modern conditions and methods of manufacture and distribution and other technological advances, the inappropriateness, and indeed the injustice, of this doctrine as applied to consumers and users other than the immediate "buyer" (as defined by the Uniform Sales Act)[48] have become so apparent that the courts of numerous jurisdictions have abolished it.[49]

In the landmark case of Henningsen v. Bloomfield Motors, Inc.,[49.1] 1960, 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1, Henningsen bought an automobile as a Mother's Day gift to his wife, which intention was communicated to the dealer. While the wife was driving the car, she was injured as the result of an accident caused by a defect in the steering mechanism. The court held that the wife could recover against both the manufacturer and the dealer for breach of implied warranty, although there was no privity between her and either of them. The court said, 161 A.2d at page 100:

"It is important to express the right of Mrs. Henningsen to maintain her action in terms of a general principle. To what extent may lack of privity be disregarded in suits on such warranties? In that regard the Faber case [Faber v. Creswick, 31 N.J. 234, 156 A.2d 252, 78 A.L.R. 2d 1230] points the way. *By a parity of reasoning, it is our opinion that an implied warranty of merchantability chargeable to either an automobile manufacturer or a dealer extends to the purchaser of the car, members of his family, and to other persons occupying or using it with his consent. It would be wholly opposed to reality to say that use by such persons is not within the anticipation of parties to such a warranty of reasonable suitability of an automobile for ordinary highway operation. Those persons must be considered within the distributive chain."* (Emphasis added.)

True, in that case, the dealer knew that the car was being purchased for the wife and the wife was a part of the family of the purchaser, whereas in the case at bar, the skirt was not purchased for the plaintiff and the plaintiff was not a part of the family of the purchaser, although closely related by marriage. Also, the statement of the court that the implied warranty extends to other persons occupying or using the car with the purchaser's consent, is dictum. However, it is clear that, under the broad and enlightened general principles of public policy for the protection of the consumer injured by a defective and dangerous product laid down by the Supreme Court of New Jersey a person in the position of the plaintiff in the case at bar could recover from the seller.

The same enlightened policy has been followed in Kansas, a state which has not adopted the Uniform Sales Act, in B. F. Goodrich Company v. Hammond, 10 Cir., 1959, 269 F.2d 501, 504, where the court said:

"The question arises as to whether an implied warranty ran to Berneice, privity between her and Goodrich being absent.

"Under the law of Kansas an implied warranty is not contractual. It is an obligation raised by the law as an inference from the acts of the

---

47. See Frumer & Friedman, Prod.Liab., §§ 16.03(1) and (2), pp. 376–382; Hursh, Am.Law of Prod.Liab. §§ 6:14–6:16, pp. 530–537.

48. R.L.H.1955, § 202–75—That the term "legal successor in interest," is generally strictly limited so as not even to include a purchaser from the buyer is indicated in Prod.Liab. § 16.03(2), p. 400.

49. See authorities cited in Note 47, and discussion post. In Greenberg v. Lorenz, 1961, 9 N.Y.2d 195, 213 N.Y.S.2d 39, 173 N.E.2d 773 it is stated that about 20 states have abolished such requirement in warranty cases.

49.1. New Jersey adopted the Uniform Sales Act in 1907, N.J.S.A. 46:30–1 et seq.

parties or the circumstances of the transaction and it is created by operation of law and does not arise from any agreement in fact of the parties. *The Kansas decisions are in accord with the general rule laid down in the adjudicated cases.* And under the Kansas decisions *privity is not essential where an implied warranty is imposed by the law on the basis of public policy."*

In the case of Martin v. J. C. Penney Company, 1957, 50 Wash.2d 560, 313 P. 2d 689, in a state which had adopted the Uniform Sales Act in 1925, RCWA 63.04.010 et seq.—four years before Hawaii adopted its Act—a woman purchased a shirt for her son from J. C. Penney Company. Being highly flammable, it caught fire and burned the son. The court permitted recovery by the son without even mentioning privity. Undoubtedly, the holding is based on the theory that no privity is necessary where the article worn was so highly flammable as to render it *inherently dangerous*— again a matter of the public policy of the state.

If, as contended by defendants, the Uniform Sales Act is *exclusive* and *pre-empts the field,* we should logically have the following result: Since the Act makes *no exception* for *any particular category of goods,* an implied warranty of (a) quality and fitness for use, and (b) merchantability, for *every category of goods, including food,* would run only in favor of the *buyer* (which, under § 202–75 could only include the buyer or his "legal successor in interest")[50] *and no one else.* Yet, as hereinafter demonstrated, by the clear weight of authority today, even in jurisdictions having the Uniform Sales Act, with respect to food and/or some other categories of goods, such a warranty runs to others than the immediate buyer as narrowly defined in the Act. (§ 202–75 supra).[50]

Even the doctrine of privity, which is the main stumbling block to extending a remedy to consumers generally (as distinguished from the immediate buyer) against a seller or manufacturer of a defective or dangerous product, has itself been used to extend the remedy to others than the buyer as defined by the Uniform Sales Act, through various expedients adopted by the courts (some of these being called subterfuges by some writers), such as adopting (a) the theory of a third party beneficiary contract,[51] (b) the agency theory,[52] or (c) some other fiction to establish a relationship between the injured consumer and the seller or manufacturer.[53] Although these decisions, which purport to adhere to the requirement of privity, can be cited as allegedly sustaining the privity requirement, in their essence they constitute pro tanto a departure from the ordinary literal language of the Uniform Sales Act, and particularly the words in §§ 202–15 and 202–75, if such words are exclusive and pre-emptive of the field of implied warranty. Thus they pro tanto indicate that the Uniform Sales Act, for all its alleged intent to pre-empt the field and to make uniform the law of sales, nevertheless did not, and does not, render static as of any given date the general law of sales in any particular jurisdiction or in all jurisdictions, but the same is still subject to modification by court decision, at least in the area of implied warranty here involved, to meet new or changing conditions or adjust to correct demonstrated inequities as is the case with respect to any other common law concept.

It is well to remember, in this connection, that privity is not expressly mentioned in the Uniform Sales Act, but is a supposed requisite tracing its origin to an old English decision in 1842 on a question of pleading in a case involving an alleged negligent breach of an express contract between the defendant and a

---

50. See Note 48 supra.

51. Hursh, Am.Law Prod.Liab., § 6:11, pp. 524–526 and Note 6.

52. Ibid, § 6:4, p. 514.

53. Ibid, § 6:3, p. 513 and Note 6.

party other than the plaintiff, rather than one of liability of a manufacturer or seller to an ultimate consumer.[54] Lord Abinger, C.B., feared "absurd and outrageous consequences" unless privity of contract was required and Alderson, B., was of the opinion that "the only safe rule is to confine the right to recover to those who enter into the contract." [54] The unsoundness of the privity requirement is indicated, among other things, by the following circumstances: (a) that at first it was extended and applied to deprive consumers generally of a remedy against the manufacturer in *negligence* cases, and "has been the subject of much dissatisfaction, and much criticism;" [55] (b) that because of its lack of foundation in sound reason, or equity, and its unworkability in modern times under modern technological conditions of manufacture and marketing,[56] the attempt of the courts "to make the jurisprudence of the present period conform to existing social and economic conditions" by the creation and enlargement of numerous exceptions, has been such that "these exceptions have reached a place in the law where they have almost, if not completely, swallowed up the so-called 'rule' "; [57] and (c) that the result has been that "The requirement of privity of contract in negligence suits against manufacturers and sellers is * * * gradually vanishing." [58]

Bearing in mind, as above stated, that the doctrine of privity, which originated with and was originally applied to *negligence* cases, *is being rejected in whole or in part in virtually all jurisdictions with respect to negligence cases,*[58] we next consider the requirement of privity in *implied warranty* cases. Historically, it appears that the remedy on implied warranty by a consumer against a manufacturer or seller for injuries suffered from a defective or dangerous product did not originate as a contractual concept, but that the original implied warranty action was tortious in nature.[59] It is pointed out in a quotation from the Rogers case [59] that the recognition of such a right of action rested on the *public policy* of *protecting an innocent buyer from harm*, rather than to insure any *contractual* rights. Tested by actual application to specific cases, the doctrine of privity, in those jurisdictions where it is applied in implied warranty cases, has not resulted in protecting the innocent consumer, but rather has resulted, in a great many cases, in rank inequity and injustice. These circumstances are mentioned here because they lead up to the public policy arguments hereinafter set forth, which in their essence have been the motivating force of the decisions of those enlightened jurisdictions which have either drastically limited, or entirely

54. Winterbottom v. Wright (1842), Mees & W. 109, 152 Eng.Reprint 402; Hursh, American Law of Products Liability, § 6:14, pp. 530–532.

55. Hursh, Am.Law of Prod.Liab. § 6:15, p. 533. See also Note No. 13 to this text, p. 533, stating, "As a consequence of the dissatisfaction with the rule, many exceptions to it have been drawn * * * and it has been entirely repudiated in many jurisdictions * * * including the jurisdiction in which it was established * * * *". In support of this statement the note cites Am.Law of Prod.Liab. § 6:57, pp. 629–630 discussing the Winterbottom case, and citing M'Alister v. Stevenson (Eng) [1932] AC 562 (HL), frequently cited as the Donoghue Case.
Frumer & Friedman, Prod.Liab. § 5.01, p. 14; § 16.03(2), pp. 378–382.

56. Hursh, Am.Law of Prod.Liab. § 6:16, pp. 534–537; Frumer & Friedman Prod. Liab. § 16.03 [2], pp. 378–382.

57. Hursh, Am.Law of Prod.Liab., § 6:16, p. 536.

58. Hursh, Am.Law of Prod.Liab. § 6:17, p. 537. See note 12 of § 6:14, p. 532, which states that the original general rule established by the Winterbottom case "has now been rejected in whole or in part in virtually all jurisdictions."
Frumer & Friedman, Prod.Liab. §§ 5.01, 5.02, pp. 14–17.

59. Frumer & Friedman, supra, § 16.03, pp. 376–378, citing Rogers v. Toni Home Permanent Co., 1958, 167 Ohio St. 244, 147 N.E.2d 612, 75 A.L.R.2d 103.

disavowed, the requirement of privity in implied warranty cases.

The *clear majority* of jurisdictions *today* have rejected the requirement of privity in implied warranty cases of this nature, *either in whole or in part.* As proof of this statement there is attached to this decision, as Appendix I, a table covering an exhaustive study of the American authorities on privity, with the following results:

Number of American jurisdictions holding privity necessary in all cases ......... 15

Number of American jurisdictions holding privity not necessary in any case .... 4

Number of American jurisdictions holding privity not necessary in food cases .. 17

    Total 21
Add:
Washington, which holds privity not necessary in food cases, and where product is inherently dangerous ....... 1

    Totals .............. 22 v. 15

As already noted supra, even in some of those jurisdictions which purport to hold privity necessary for recovery on implied warranty, the courts, by devious means, or a simple process of what might be called "judicial license", have extended the right of recovery as to certain classes of commodities such as food, etc. *to others than the strict "buyer"* as defined in the statute. This they have done by purporting to include in the category of "buyers" persons other than a "buyer" as defined by the Act, on one or another theory of agency, third-party beneficiary contract, or some other fictitious or plausible theory.[60] Instead of militating against the conclusion here expressed, these decisions actually reinforce it by proving that in situations *where public policy as to a particular category of goods was strong enough, such public policy justified a de-* *parture from the strict wording of the statute.*

This is done by relying upon an extension of the classes of persons covered by the so-called common-law doctrine of "privity", not even mentioned in the Act. But if this privity can be used to pry open the so-called *exclusive* barrier of the Act so as to admit an implied warranty remedy to certain consumers, other than "buyers", *for food cases*, because of *"public policy"*, by what reasoning can it be held that the barrier excludes allowance of the same remedy to other non-"buyers" as to whom the *public policy of protection appears to be equally justified.* It appears that the proponents of such an exclusionary theory are attempting to *freeze* the doctrine of privity at a specific point in its development, contrary to all the traditions of the common law.

The fallacy of this exclusionary or "freezing" theory, is apparent when one considers the following circumstances, as already noted ante. In the first place, the doctrine of privity started as a common law theory hatched up in the minds of the judges who wrote the Winterbottom decision (see Note No. 54). Like any other common law concept, it was developed and extended by later decisions, then modified and restricted when its fallacy came to be realized, until it almost disappeared as to negligence cases, but it was extended to implied warranty cases by the same process, where it persisted more stubbornly because at first theoretically it seemed more at home in the contractual field in which implied warranty came to be classified. Since then the privity requirement has again suffered steady erosion in jurisdiction after jurisdiction, even in implied warranty cases. In these respects this process has truly exemplified the capacity of the common law to originate, modify, abandon, extend or adjust ideas, theories and rules to meet changing conditions or achieve greater perfection in rendering justice. Those who would freeze privity at any one stage of its development are both ignoring its

60. See Notes Nos. 51, 52, 53 ante.

common-law origin as an imperfect idea in the fallible human brains of certain judges—not a divine unchanging principle in which there can be no error—and denying its common-law capacity to develop. The truth is that privity was never a static concept, and it should not now be any more static than the common law is static, unless clearly restrained by express statute.[60.1]

It will be argued that the Uniform Sales Act made it static. But as of what time? Even while various jurisdictions were adopting the Act at different times, the doctrine of privity was also changing. Even though an act is originally designed to be uniform, this can be achieved only if all jurisdictions uniformly construe it. And if, over a course of years, a majority of jurisdictions modify a previously supposed uniform construction, what then is a court to follow—the old and now minority view, or the new and majority view?

The Hawaii Supreme Court has not from the very beginning, and especially during recent years, regarded itself as bound to adopt for this jurisdiction a static common law, or the majority view of other jurisdictions, if a sounder, more just and equitable new rule can be devised. Although R.L.H. 1955, § 1–1, adopting the common law, has been on the books since 1892, the Hawaii courts have on numerous occasions refused to follow, and departed from the majority

60.1. In 2 Harper & James, Law of Torts, 1570, § 28.16, in discussing the refusal of many courts, which have repudiated the requirement of privity where recovery is grounded on negligence, to ground liability on warranty except in actions by the buyer against the person who sold the dangerous article to him, the authors say, at pp. 1571–2:

"Perhaps such a limitation corresponds to the reasonable expectations of commercial buyers and sellers when they are concerned with trade losses. But where commodities are dangerous to life and health, society's interest transcends that of protecting reasonable business expectations. It extends to minimizing the danger to consumers and putting the burden of their losses on those who best can minimize the danger and distribute equitably the losses that do occur. And since the warranties involved in these cases do not represent the expressed or implied-in-fact intent of bargainers, but are warranties imposed by law as vehicles of social policy, the courts should extend them as far as the relevant social policy requires. The interest in consumer protection calls for warranties by the maker that *do* run with the goods, to reach all who are likely to be hurt by the use of the unfit commodity for a purpose ordinarily to be expected."

At p. 1573, the authors say:

"No valid reason appears for distinguishing between food cases and others so far as the privity requirement is concerned."

At p. 1606 the same authors say:

"As the accident toll of modern life has increased, the urge towards strict liability has grown. Many older forms of liability were vehicles for such a principle but none of them is well adapted to solving our present accident problem. Warranty is a case in point. This was fashioned to serve commercial needs in a commercial context, and however well or ill adapted it is to that end today, its technicalities and limitations reflect those needs. If it occasionally happens to fit the needs of accident law, that is pure coincidence. As a general proposition it does not. If strict liability should be imposed in these cases as a matter of policy, there is no more reason than there is in connection with the negligence doctrine to confine the scope of liability to those in privity of agreement. The need for protection is as wide as the likelihood of this kind of harm, and all such harm may fairly be regarded as a casualty of the supplier's enterprise. Not only the rule of privity, but also many other limitations on warranty liability which we have treated here, are out of place in the context of accident law. They would all be abandoned in a rational scheme of strict liability for injurious products. In some cases this may require legislation. Yet the concept of the warranty implied in law on grounds of policy was devised by courts in the past to meet commercial needs. Why should not the courts of today—entirely within the tradition of a dynamic common law—develop a warranty theory in products liability cases which is tailored to meet modern needs in that field—at least where existing legislation does not positively and clearly forbid such a development? To some extent this has taken place. The process should and no doubt will continue."

common law views of other jurisdictions. Numerous examples of this independent and forward-looking attitude are given in notes to § 1–1 in the Revised Laws of Hawaii 1955. A few of the cases, however, will serve to illustrate this.

In Lum v. Fullaway, 1958, 42 Haw. 500, adult children were held to have a duty to support an indigent parent, and as a consequence the court held such adult children entitled to sue, in their own right, a tort-feasor for reimbursement of medical and funeral expenses incurred for their deceased parent whose death was caused by the tort-feasor's negligence. The defendants had taken the position that the plaintiffs had no independent right of recovery and had no derivative right because at the time of the parent's death there was no local statute providing for the survival of tort claims. The court said that plaintiffs' right to sue was not derived from the parent's right of recovery. The court, said, at pages 502–504:

*"Plaintiffs' right to relief is not necessarily foreclosed by lack of precedent.* True, there is a constant admonition against judicial legislation. *But the genius of the common law, upon which our jurisprudence is based, is its capacity for orderly growth.* (Dole v. Gear, 14 Haw. 554; Territory v. Alford, 39 Haw. 460; Welsh v. Campbell, 41 Haw. 106; Halberg v. Young, 41 Haw. 634) *The vehicle by which such growth is accomplished is what may be described as judge-made law.* This is evident in the utterances of such learned oracles of law as Sir Frederick Pollock, Judge Benjamin Cardozo and Judge Learned Hand. (Pollock, 'Judicial Caution and Valour,' Jurisprudence in Action, p. 367; Cardozo, The Nature of Judicial Process, p. 28; Hand, 'Cardozo's Nature of Judicial Process,' Jurisprudence in Action, p. 235).

"Sir Frederick Pollock states:

"'Ever since there have been in England regular courts of justice administering the law of the land, their duty has been understood not to be fulfilled merely by finding some decision for every case, *but to extend to declaring rules of law, and developing them to meet new occasions, so* far as may be done without disobeying the expressed will of the Legislature or contravening doctrine already settled or confirmed by former judgments.'

"The same theme is set forth by Judge Hand as follows:

"'The position of an English speaking judge, especially, presents an apparent contradiction that has always exercised those who are speculatively inclined. The pretension of such a judge is, or at least it has been, that he declares pre-existing law, of which he is only the mouthpiece; his judgment is the conclusion of a syllogism in which the major is to be found among fixed and ascertainable rules. Conceivably a machine of intricate enough complexity might deliver such a judgment automatically were it only to be fed with the proper findings of fact. Yet the whole structure of the common law is an obvious denial of this theory; it stands as a monument slowly raised, like a coral reef, from the minute accretions of past individuals, of whom each built upon the relics which his predecessors left, and in his turn left a foundation upon which his successors might work.'

"Perhaps, the recent trend is to rely more on legislatures, and less on courts, for the growth of law. *Nevertheless, judicial law-making continues inexorably.* This is recognized by Judge Cardozo, who states: '*We leave more to legislatures today, and less perhaps to judges. Yet even now there is change from decade to decade. The glacier still moves.*'"

"Judicial law-making does not mean that judges may roam at will

on a frolic of their own. Judge Cardozo again aptly sets forth the responsibility of a judge, when confronted with a novel question, as follows:

" 'In this perpetual flux, the problem which confronts the judge is in reality a twofold one; he must first extract from the precedents *the underlying principle, the ratio decidendi; he must then determine the path or direction along which the principle is to move and develop, if it is not to wither and die.'* " (Emphasis added.)

In Estate of James Campbell, 1954, 40 Haw. 543, the court in effect overruled two previous decisions in the *same estate matter* construing the *same will,* as to the power of trustees to make leases extending beyond the term of the trust. where not expressly given that power, and held, in line with what it considered the *enlightened and modern theory* of construction of leases and trusts, that the trustees had such power. In so doing, the majority refused to follow what was pointed out in the dissenting opinion to be the clear weight of authority (and hence, in effect, the majority common law rule of trusts), and a rule which had been so long established in Hawaii as to constitute a rule of property. The majority opinion says, among other things, speaking of the doctrine of res judicata,

" * * * Within the framework of a trust, however, the doctrine *as an embodiment of public policy does not require a holding that a construction* of a will to define the powers of a trustee toward distinct property of the trust *once made should never be questioned and corrected, if found to be erroneous,* in the future administration of the trust with respect to different property, but must remain unchangeable like the law of the Medes and Persians. * * * " (at pages 547–548) (Emphasis added.)

The majority opinion points out the *differences between conditions existing when the rule* confining the powers of the trustee to make leases only to the duration of the trust *was first made and followed,* and *modern conditions* as to long-term leases and quotes with approval the statement from another jurisdiction that,

*"From these differences* of consideration, it is understandable that 'the elementary principle laid down in textbooks and decisions, that a leasehold, in the absence of some reason for doing so, may not extend beyond the quantity of estate held by the lessor' lent itself readily as a convenient solution of the *then-existing problem in the prior cases and yet affords no solution of the now-existing problem in the instant case.* * * * " (at page 553) (Emphasis added.)

Finally at page 558 the majority opinion says:

"This court *recognizes a conflict* in the authorities as to general powers of trustees *but believes the better rule* permits trustees to make leases beyond the periods of their trusts if in so doing they give effect to the scheme and intent of the trustor. The position taken here accords with the statutory rule for extending leases for trust property." (Emphasis added.)

(Citing a statute enacted long after the will had been probated and after it had been first construed by the Hawaii Supreme Court as not authorizing leases by the same trustees beyond the term of the trust).

In Welsh v. Campbell, 1955, 41 Haw. 106, 118–121, although the Supreme Court, after thoroughly analyzing the authorities, ultimately followed what might be considered the majority common law rule, nevertheless did so, *not because it felt bound by such precedents,* but because it *considered the rule ultimately adopted as the superior one.* The court cited and quoted with approval various decisions as follows:

"Though the present proceeding is an equitable one, the case of Dole v. Gear, 14 Haw. 554, held that *equity*

*is included in the common law* within the meaning of this statute (R.L.H. 1945, § 1) and further pointed out that *the common law consists of fundamental principles and reasons and is a system of legal logic rather than a fixed and inflexible set of rules.* This case has been quoted with approval in a number of Hawaiian cases, the latest of which is Territory v. Alford, 39 Haw. 460.

"In Dole v. Gear, as well as in Territory v. Alford, supra, the following quotation from Morgan v. King, 30 Barb. 9, appears: ' * * * "when it is said that we have in this country adopted the common law of England, *it is not meant that we have adopted any mere formal rules, or any written code, or the mere verbiage in which the common law is expressed.* It is aptly termed the *unwritten law* of England; and we have adopted it as a *constantly improving science,* rather than as an *art; as a system of legal logic, rather than as a code of rules. In short, in adopting the common law, we have adopted its fundamental principles and modes of reasoning, and the substance of its rules as illustrated by the reasons on which they are based, rather than by the mere words in which they are expressed."* ' (Dole v. Gear, supra [14 Haw. at pages] 561, 562).

"In Territory v. Alford, supra, the court held that a wife might testify against her husband where she was the victim of the husband in a white slave case even though at common law and the Hawaiian statute embodying the common law that provides one spouse cannot testify for or against another in a criminal prosecution except in case of an offense of *physical* violence committed by one against the person of the other. *The court held that it was not restricted by the actual decisions at common law, stating that the common law interpreted in the light of modern experience, reason and the furtherance of justice,* this prohibition does not apply; it permits a wife to testify against her husband in a prosecution for a crime committed by the husband which corrupts the wife's morality; that this is an offense 'against the person of his wife'; that the same reasons apply to the one as to the other.

"Again, as stated in the case of Macaulay v. Schurmann, 22 Haw. 140, 144, 'And, as pointed out in Dole v. Gear, 14 Haw. 554, 561, *the common law consists of principles and not of set rules and admits of different applications under different conditions * * *.*'

"Some other cases dealing with the nature of common law are: .

"The People v. Randolph, 2 Parker's Cr.R. 174, 176, which states: 'The common law consists of those principles and maxims, usages and rules of action which observation and experience of the nature of man, the constitution of society and the affairs of life have commended to enlightened reason, as best calculated for the government and security of persons and property. Its principles are developed by *judicial decisions* as necessities arise from time to time demanding the application of those principles to particular cases in the administration of justice.' (Emphasis added.)

" 'The *common law is but the* crystallized conclusions of the judges arrived at from applying the principles of natural right and justice to facts actually experienced in cases before them.' (Scott v. Kirtley, 113 Fla. 637, 152 So. 721, 722 fn. [93 A.L.R. 661])

" '*The common law does not consist of absolute, fixed, and inflexible rules, but rather of broad and comprehensive principles based on justice, reason, and common sense. It is of judicial origin and promulga-*

*tion. Its principles have been determined by the social needs of the community and have changed with changes in such needs. These principles are susceptible of adaptation to new conditions, interests, relations, and usages as the progress of society may require.'* (Miller v. Monsen, 228 Minn. 400, 37 N.W.(2d) 543, 547.)

"That the common law is not arrived at by simply following the English decisions is shown in Sayward v. Carlson, 1 Wash.St. 29, 40 [23 P. 830] where in construing a statute similar to the Hawaii statute it was stated: 'But we do not subscribe to the next proposition, that resort can be had only to the decisions of English courts, or to those of American courts which have followed them * * *. * * * *since courts have had an existence in America they have never hestitated to take upon themselves the responsibility of saying what is the common law, notwithstanding current English decisions, especially upon questions involving new conditions.* Therefore, we have the "common law" as declared by the highest courts of this, that and the other state, and by the courts of the United States, sometimes varying in each. And we understand by § 1 of the code, *that where there are no governing principles of the written laws, the courts of the late territory, and of this state, are, in all matters coming before them, to endeavor to administer justice according to the promptings of reason and common sense, which are the cardinal principles of the common law; but not that the decisions of the English courts are to be taken blindly and without inquiry as to their reasoning or application to the circumstances.'*

"Where there are no governing provisions of the written law, the courts in all matters coming before them endeavor to administer justice 'according to the promptings of reason and common sense.' The common law is declared by the highest courts of each State and varies in the several States, and the *courts of Hawaii can continue to declare, as they have in the past, the common law of Hawaii based upon justice and sound reason and not inconsistent with settled authorities."* (Emphasis added.)

In Territory v. Alford, 1952, 39 Haw. 460 (cited in the preceding quotation) the court, at page 465, said:

*"Assuming that the Hawaiian statute is a codification of the common law, let us therefore examine what the common law rule was and is as interpreted by enlightened modern authorities* in regard to testimony of a wife against her husband for an 'offense against' her 'person'. * * * In this connection it has often been said that *the common law is not immutable but flexible and by its own principles adapts itself to varying conditions."* (Emphasis added.)

See also Territory v. Ota, 1942, 36 Haw. 80, 97–98, citing Territory v. Chong Chak Lai, 1909, 19 Haw. 437, 439, both cited post, notes Nos. 63 and 64, holding that an imported construction of a statute from another jurisdiction which had previously been construed in that jurisdiction, should prevail in Hawaii *only insofar as it is in harmony with the spirit and policy of the general legislation of the home state.*

In Kamau & Cushnie v. Hawaii County, 1957, 41 Haw. 527, the court refused to follow the doctrine of stare decisis, and adopted *the minority and enlightened view* over the old majority common law view as to the liability of a municipality for torts committed in the course of performing governmental functions. The court, among other things, said, at pages 536–537:

*"There has been a great expansion of governmental activities in modern*

*times. Activities which are now taken for granted as governmental were formerly left to private initiative,* such as education; collection of sewage and rubbish; there was not even a municipal police force until 1829 when Sir Robert Peale established the London police force, from whose name the term 'bobbies' was applied to police; volunteer fire departments were in many cities, and in New York the volunteer fire organization was Boss Tweade's chief political strength. The furnishing of water is still regarded as a proprietary function although nothing is more important to the health of the community than a pure water supply. 'Pure water is man's greatest need' is the slogan of the Honolulu water supplier.

"*In view of this, it is not strange that the tendency of modern times is to extend the liability of municipalities for tort actions. In a number of jurisdictions this has been done by court decisions, in others by statute,* and the *United States Government has enacted a Tort Liability Act, all showing keen dissatisfaction with the present condition of the law* of governmental immunity for torts *as declared by the decisions.*

"As this welter of decisions has resulted in *so much confusion, absurdity and injustice, it may be well for us to go to the basis for the so-called 'rule' of nonliability of a municipal corporation for certain of its torts. It is time to take new bearings and see how far we have drifted from logic and common sense.* As stated by Daniel Webster, 'When the mariner has been tossed for many days in thick weather, and on an unknown sea, he naturally avails himself of the first pause in the storm, the earliest glance of the sun, to take his latitude, and ascertain how far the elements have driven him from his true course.'

(Webster's second speech on Foot's Resolution.)"

At page 539 the court also says:

"*An individual has a right as against the world to be free from damage to his property or injury to his person by the tortious acts of another, and the ordinary rule is that for the violation of such right he may recover his damages; 'for every wrong there is a remedy.'* The exception to this rule, that a person so injured or damaged may not recover from a sovereign State is not that his rights have not been invaded, but that the State is *immune to suit.* Some of the authorities point out that there is a difference between immunity to suit and an immunity to liability; that the first may be a personal immunity. *The Austinian theory that a legal right exists only where there is a legal remedy is somewhat analogous to the denial of the existence of a disease that injures and cripples thousands because there is no remedy for such disease.*"

At pages 549 et seq. the court cites numerous authorities illustrating the principle that

" 'The doctrine of stare decisis was never intended to tie the hands of a Supreme Court and prevent it from correcting its own errors, or from making adjustments in the law to meet the needs of people who must rely on the courts for the protection of their interests.' ",

citing Freedom of Litigation by Leon Green, 38 Illinois Law Review 117–118 (41 Haw. 550).

The court closes by saying, after overruling six previous Hawaii decisions:

"*Conditions change with the times and our decisions must meet changing conditions. The law is not static but consists of fundamental principles and reasons and the substance of rules as illustrated by the reasons on which they are based rather*

*than the mere words in which they are expressed. It must adapt itself to various conditions as interpreted in the light of modern experience, reason and the furtherance of justice.* (Territory v. Alford, 39 Haw. 460; Dole v. Gear, 14 Haw. 554.)

"We are of the opinion that the narrow rule heretofore followed as to so-called 'governmental' or public functions and 'proprietary' or private functions should not control the question of municipal liability for its torts; that where its agents are negligent in the performance of their duties so that damage results to an individual, it is immaterial that the duty being performed is a public one from which the municipality derives no profit or that it is a duty imposed upon it by the legislature." (41 Haw. 552)

While the foregoing case was not one involving a claim based on implied warranty, it indicates the *open-mindedness of the Hawaii Supreme Court* and its *determination to follow rules designed to achieve greater justice and equity rather than to be hidebound and confined by narrower earlier common law rules no matter by how many jurisdictions adopted.*

Finally, even where the Hawaii Supreme Court has decided to follow the majority rule, it has done so in *full recognition of its right to refuse to adopt the same if a superior rule can be devised,* and has followed the majority rule only because after analysis it determined that *the same was, in fact, the better rule.* Thus, in Beckstrom v. Hawaiian Dredging Co., Ltd., 1958, 42 Haw. 353, the court decided to follow the majority and enlightened view that blasting is considered necessarily and inherently dangerous, and hence one who undertakes to blast so near to another's property as to be liable to cause damage must assume the risk of any damage resulting from vibrations or concussion, *irrespective of negligence.* In reaching this conclusion the court points out and cites with ap-

proval from Prosser on the Law of Torts 2nd ed., Chap. 11, § 56, p. 315, that

"*Modern law is developing a policy of imposing liability without regard to 'fault' particularly in cases where the defendant's activity is an unusual one involving abnormal danger to others, even though it is carried on with all possible precautions.*"

The court also cites copiously from Harper & James, the Law of Torts; from the American Law Institute, Restatement, Torts, and other modern authorities. (See 42 Haw. 355–357).

While the Beckstrom decision did not deal with an implied warranty claim, the analogy is apparent, and the case again indicates the open-minded attitude of the Hawaii Court and reinforces the view here adopted that, faced with the conflicting decisions of other jurisdictions, that court will adopt the enlightened view of *extending the remedy* rather than restricting it.

The foregoing decisions all confirm the conclusion that R.L.H.1955, § 1–1, and the legislative declaration of intent in enacting the Uniform Sales Act, set forth in the legislative reports cited ante (Note No. 41), do not require the Hawaii courts to adopt as the common law of Hawaii, the majority view of other jurisdictions, as a sort of frozen, static rule, if in their view, some other rule is sounder and more equitable either because of modern changes or conditions, or because of defects or inequities found to exist in the old rules, or both. Nor can it be said, in view of the foregoing indications that a majority of jurisdictions have not construed the Uniform Sales Act as absolutely exclusive and pre-emptive, that the Hawaii Act by its terms requires us to follow a static concept of privity as of a certain date or stage of its development.

Going back, now, to the Hawaii Uniform Sales Act, it would appear to be obvious that the only way to reconcile with that Act decisions extending to a consumer who is not strictly the buyer of

the product a remedy against the seller based upon implied warranty, as in this case, is to hold as was done by the California court in the Klein case,[61] *that it was not the intent of the legislature,* at least with respect to the particular products there concerned, which happened to be food stuffs, *that the implied warranty provision should be exclusive,* and thereby exclude consumers other than the immediate buyer. This conclusion was reached on substantially the same ground hereinabove stated, namely, that *at least as to food stuffs, most courts conceded* that the *consumer who was not strictly the immediate buyer did have a cause of action in implied warranty against the seller, notwithstanding the absence of privity.* In so doing, it is believed, the California court put its finger upon *the exact ground upon which such decisions eliminating or modifying the strict privity rule can be justified in the face of the Uniform Sales Act.*

That such a construction of apparently all-inclusive language in a statute having no express exceptions, is legitimate if the *legislative intent* (which is believed simply to mean the *public policy of the state otherwise manifested) is sufficiently clear,* is established by such decisions as the Church of the Holy Trinity v. United States, 1892, 143 U.S. 457, 12 S.Ct. 511, 516, 36 L.Ed. 226, in which, after considering the broad general language of the Immigration Act there construed (prohibiting, without express exception, immigration of aliens under service or labor contracts) and holding that the law did not prohibit immigration of ministers of religion under service contracts, the court said:

"It is the duty of the courts, under those circumstances, to say that, however broad the language of the statute may be, *the act, although within the letter, is not within the intention of the legislature, and therefore cannot be within the statute.*"

This decision has been cited with approval by Hawaii decisions, including the Jensen case.[62]

As stated ante, the Hawaii Supreme Court has even gone so far as to hold that where a statute from another jurisdiction, which has previously been construed by the courts of that jurisdiction,

61. Klein v. Duchess Sandwich Co., 1939, 14 Cal.2d 272, 93 P.2d 799.

62. Jensen v. Secretary of Hawaii, 1954, 40 Haw. 604, 612:
"This court has held on many occasions that '*a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers.*' In Chang v. Meagher et als., 40 Haw. 96, 102, this court cites a number of decisions beginning with one of the earlier and most sweeping cases decided by the United States Supreme Court, Holy Trinity Church v. United States, 143 U.S. 457 [12 S.Ct. 511, 36 L.Ed. 226], from which the above quotation was taken. In the Holy Trinity Church case after reviewing the title of the Act, the evil which it was designed to remedy, the situation which existed at the time the Act was passed, the circumstances surrounding the appeal to the Congress, the reports to the committee of the House, etc., the court decided that though the wording covered the specific Acts forbidden and though the forbidden Act did not come within the specific exception set forth in the Act, the case was not within the purview of the statute.

"The Holy Trinity Church case goes to an extreme in departing from the literal construction but it promulgated no new rule of statutory interpretation. Many years before this doctrine had been set forth by Chief Justice Taney in Brewer v. Blougher, 14 Peters 178, and there are numerous other decisions of the United States Supreme Court holding that *a thing which is within the intention of the statute is as much within the statute as if it were within the letter, and a thing which is within the letter of the statute is not within the statute unless it be within the intention of the makers.*"

"As stated by Jones v. Guaranty, etc., Co., 101 U.S. 622 [25 L.Ed. 1030] 'for the letter killeth, but the spirit giveth life.' *This doctrine has been applied even in criminal cases where strict construction is the usual rule.*" (Emphasis added.)

is adopted by the Hawaii Legislature, such adoption does not adopt the construction of the foreign jurisdiction, *if it is contrary to the prevailing practice in Hawaii.*[63] This language was cited with approval in a later case.[64]

It thus appears that the courts of Hawaii have long recognized that the interpretation of a statute and its coverage, can be affected *by the public policy of the state as indicated otherwise than by the particular statute itself.* Bearing this in mind, we repeat that the Uniform Sales Act was adopted in Hawaii in 1929. By that time it had already been recognized by respectable authority that the Act's language which ordinarily might—under the theory that the Uniform Sales Act is exclusive and pre-emptive—be held to confine remedies for damages from de-

fective or dangerous products solely to the *immediate buyer, did not apply to, and hence did not exclude, a suit on implied warranty in certain special categories of cases* such as those involving the sale of unwholesome food.

*At that time (1929), the requirement of privity in negligence cases, in which field the doctrine of privity originated,* was already in the process of being repudiated in cases involving injury caused by inherently dangerous products.[64.1]

Also in the State of Washington, with which Hawaii has always maintained extensive commerce, it had already been held, in 1913 (although Washington did not adopt the Uniform Sales Act until 1925) that, under modern conditions, the manufacturer of food products impliedly warrants his goods to be safe and whole-

---

63. Territory v. Chong Chak Lai, 1909, 19 Haw. 437. The court at page 439 said, among other things:

"The presumption that the Legislature in adopting the statute of another state or of a foreign country adopts the construction of the statute made by the courts of that state or country cannot be permitted to prevail against a plain and obvious interpretation of the statute. Pratt v. Miller, 109 Mo. 78 [18 S.W. 965] (32 Am.St. [Rep.] 656). *'The imported construction should prevail only insofar as it is in harmony with the spirit and policy of the general legislation of the home State.'* Endlich on Interpretation, Sec. 371. *'While * * * it is the ordinary rule to accept the interpretation given to a statute by the courts of the country by which it was originally adopted, the rule is not an absolute one, to be followed under all circumstances.* We concur in the interpretation placed upon the Utah statute by the Supreme Court of Utah, as one required by the obvious meaning of its provisions, and we do not feel obliged, by the above rule, to reject that interpretation because apparently the highest court of the State from which the statute was taken has, in a single decision, taken a different view.' Whitney v. Fox, 166 U.S. 637, 647 [17 S.Ct. 713, 41 L.Ed. 1145]. And where the statute is too clear to require construction there is no occasion to refer to decisions elsewhere. The practice in Hawaii has always allowed the public prosecutor to engage or permit private counsel to assist in prosecutions,

and there is no reason to suppose that this practice was not in existence from the time of the earliest enacted laws." (Emphasis added.)

64. Territory v. Ota, 1942, 36 Haw. 80, 97–98, in which the court said:

"This court has several times announced the familiar rule of construction that the adoption of a statute from another jurisdiction after said statute has been construed carries with it the construction placed upon it by the courts of the jurisdiction from which it was borrowed. (Carter v. Gear, 16 Haw. 242, affirmed 197 U.S. 348 [25 S.Ct. 491], 49 L.Ed. 787; Middleditch v. Kalanianaole, 18 Haw. 272.) In Territory v. Chong Chak Lai, 19 Haw. 437, 439, it is said: 'The imported construction should prevail only in so far as it is in harmony with the spirit and policy of the general legislation of the home State.'

"From the foregoing we conclude that the construction placed upon the Massachusetts statute by its courts prior to 1850 must be deemed to have been adopted by the Kingdom of Hawaii and likewise by the Congress of the United States, when the libel statute was retained by sections 6 and 7 of our Organic Act, *unless the construction* is inconsistent with the Constitution of the United States or *out of harmony with the spirt and policy of the general legislation of the Territory.*" (Emphasis added.)

64.1. Hursh, Am.Law of Prod.Liab. § 6:21, pp. 546 et seq.

some, even when dispensed in original packages, and that such warranty is available to all who might be damaged by their use in the legitimate channels of trade, including retailers, as well as ultimate consumers [65] (citing Ketterer v. Armour & Co., D.C.N.Y.1912, 200 F. 322, 323):

> "Remedies of injured consumers ought not to be made to depend upon the intricacies of the law of sales. The obligation of the manufacturer should not be based along on privity of contract. It should rest, as was once said, upon 'the demands of social justice.'" At page 635.

It is pertinent to note that, as stated in the Klein case supra (See Note No. 61) 93 P.2d 799, 803, " * * * the case entitled Mazetti v. Armour & Co. * * *, although decided prior to the time the Uniform Sales Act became a part of the law of the state of Washington, frequently has been cited in the later cases dealing with the question here being considered. * * *"

The Washington Uniform Sales Act was adopted in 1925, 12 years after the Mazetti case, but in Martin v. J. C. Penney Co., 1957, 50 Wash.2d 560, 313 P.2d 689, in a case involving a dangerously flammable shirt, the court had no difficulty in the face of its Uniform Sales Act in allowing recovery by an injured boy who was not the immediate buyer, the shirt having been purchased by his mother, thereby following a logical extension of the rule of the Mazetti case.

Bearing in mind the foregoing authorities and arguments indicating (a) that the doctrine of implied warranty originated in a judicially sound *public policy* of *protection of the consumer;* (b) that even in those jurisdictions where the privity doctrine is enforced, expansion of the class covered by strict privity to permit *others than the immediate buyer* to sue, has been based on the same kind of public policy; and (c) that where privity has been dispensed with, such action has been based on similar *public policy,* we now proceed to examine the corresponding *public policy of the Territory,* now State, *of Hawaii,* with particular reference to the conditions which existed in 1929 when the Uniform Sales Act was passed, and the developments since then and before 1956, indicative of such public policy.

Even in 1929, there were already in effect Federal laws enacted under the plenary power of Congress under the Constitution, Art. IV, sec. 3, peculiarly applicable to Hawaii as a Territory, indicating a special public policy both national *and local* for *protection of the consumer.* Thus the original Pure Food and Drug Act, enacted in 1906, was in effect [66] including 21 U.S.C.A. §§ 1 and

---

65. Mazetti v. Armour & Co., 1913, 75 Wash. 622, 135 P. 633, 635, 636, 48 L.R.A.,N.S., 213. The court said at page 636 of 135 P.:

"*To the old rule* that a manufacturer is not liable to third persons who have no contractual relations with him for negligence in the manufacture of an article *should be added another exception,* not one arbitrarily worked by the courts, but *arising,* as did the three to which we have heretofore alluded, *from the changing conditions of society. An exception to a rule will be declared by courts when the case is not an isolated instance, but general in its character, and the existing rule does not square with justice.* Under such circumstances a court will, if free from the restraint of some statute, declare a rule that will meet the full intendment of the law. No case has been cited that is squarely in point with the instant case; but there is enough in the adjudged cases to warrant us in our conclusion." (Emphasis added.)

66. See 21 U.S.C.A. §§ 1 and 2, reading: "Section 1. Adulterated or misbranded foods or drugs; manufacture in Territories or District of Columbia unlawful; penalty. It shall be unlawful for any person to manufacture within any Territory or the District of Columbia any article of food or drug which is adulterated or misbranded, within the meaning of sections 1 to 15, inclusive, of this title; and any person who shall violate any of the provisions of this section shall be guilty of a misdemeanor, * * *."

"§ 2. Same; interstate or foreign commerce in prohibited; sale in Territories

2, expressly applying to Territories. Under that original Act "drug" and "food" were already broadly defined.[67]  In Armour v. Wanamaker [68] it was held that, under the Pure Food and Drug Act supra, defendant's omission to properly brand, and the introduction in interstate commerce of, a bottle of hair tonic which exploded causing injury, afforded competent evidence for submission to the jury of the question of negligence, under the rule that omission to fulfill a statutorily imposed obligation created statutory negligence.  Although that was a negligence case, it nevertheless signified the establishment of a local *public policy* in the Territory of Hawaii of protecting the consumer as early as 1906, and continuing after the enactment of the Hawaii Uniform Sales Act.

In this connection a reference to the early Hawaii case of Hegarty v. Snow[69] seems appropriate.  This case was cited by defendants' counsel on the theory that it established the common law of Hawaii prior to the adoption of the Uniform Sales Act, a rule that the seller should be held liable on an implied warranty only for a use for which the article was *known* at the time of sale to be intended. Accepting this contention at its face value, it supports the view here maintained, for it must be obvious that the defendants *knew,* at the time of the sale of the hula skirt here in question, that the skirt was intended for use *as an article of clothing.*[69.1]  Hence, even under the Hegarty decision there was an implied warranty in this case that the hula skirt was fit for use as an article of clothing, which warranty would be breached if the article was so highly flammable as to be dangerous to life and limb when worn as an article of clothing. But that case goes further: it indicates the existence also of a warranty of merchantability of the skirt as an article of clothing.[70]  Moreover it supports this court's public policy argument.[71]

or District of Columbia; penalty. The introduction into any State or Territory or the District of Columbia from any other State or Territory or the District of Columbia, or from any foreign country, or shipment to any foreign country of any article of food or drugs which is adulterated or misbranded, within the meaning of sections 1 to 15, inclusive, of this title, is prohibited; and any person who shall ship or deliver for shipment from any State or Territory or the District of Columbia to any other State or Territory or the District of Columbia, or to a foreign country, or who shall receive in any State or Territory or the District of Columbia from any other State or Territory or the District of Columbia, or foreign country, and having so received, shall deliver, in original unbroken packages, for pay or otherwise, or offer to deliver to any other person, any such article so adulterated or misbranded within the meaning of said sections, or any person who shall sell or offer for sale in the District of Columbia or the Territories of the United States any such adulterated or misbranded foods or drugs, or export or offer to export the same to any foreign country, shall be guilty of a misdemeanor, * * *."

67. 21 U.S.C.A. § 7.

68. 3 Cir., 1913, 202 F. 423.

69. 1854, 1 Haw. 198.

69.1. For authority to the effect that by merely signifying to the seller that she desired to purchase a hula skirt, the buyer made known to the seller the particular purpose for which it was required—that being that it was to be worn as a skirt—as an article of clothing—see Martin v. J. C. Penney Co., supra, 1957, 50 Wash.2d 560, 313 P.2d 689.

70. From the evidence, if plaintiff's witnesses were believed, it could have been found that Mrs. Leppard, at the time of purchasing the hula skirt asked for one that was fire proof or fire resistant. This, with the mere naming of a "hula skirt", would be a purchase of the goods "by description", and, of course, the purchase was from a seller who dealt in goods of that description, under R.L.H. 1955, § 202–15(b) quoted ante, note No. 42.

71. Thus the Hegarty decision states that Hawaii courts should, while free and unembarrassed by former decisions and precedents, establish sound rules, " * * * rules which shall have a firm foundation in reason, justice and equity, and such as shall promote fair dealing, good

If, as stated by the Hawaii legislative committee reports quoted,[72] the Uniform Sales Act when adopted in Hawaii *did not change the common law,* the exception, then, for food cases already established, and stated in the Hegarty case, would be carried over as an exception to the statutory language, even though no specific exception was made by the statute. This being so, the public policy doctrine here espoused is supported, and can be expanded to cover other exceptions based on the *same public policy* of protecting the consumer, *in situations other than food, at least where danger to life and limb of human beings is involved.*

But the foregoing are not the only indications of such a public policy. In the margin [73] are cited at least seven Hawaii Territorial statutes which were in effect before and at the time of the adoption of the Hawaii Uniform Sales Act, indicating a steadily cumulative and strengthening public policy of protecting the consumer against the seller.

There are numerous additional indications of public policy enacted since the passage, in 1929, of the Hawaii Uniform Sales Act, demonstrating a steadily increasing special legislative concern for the protection of the consumer against the seller of goods. In the margin [74] are

morals, the highest honor and the public weal." (1 Haw. 200).

That decision rejects the ancient doctrine of caveat emptor in favor of a more equitable one favoring the buyer, and proceeds to draw a distinction between the implied warranty of food as sound and wholesome *where bought by a consumer,* and where bought by a retailer for resale. The court, in justifying the implied warranty in favor of the *consumer* says:

"*It is true that an implied warranty of soundness is raised in the sale of provisions, on the ground that such a warranty is necessary for the preservation of health and life.*" (1 Haw. 202–203) (Emphasis added)

72. See Note No. 41 ante.

73. See the following sections of R.L.H. 1955:

(a) §§ 20–15 and 20–16, enacted respectively in 1884 and 1909, giving purchasers of animals afflicted with farcy or glanders in violation of the statute a right to recover the purchase price plus damages.

(b) §§ 22–70 to 22–71, first enacted in 1931, prohibiting the sale of bad eggs for human consumption under criminal penalties.

(c) §§ 51–40 to 51–47 first enacted in 1925, prohibiting, among other things, sale of cold-storaged food without proper labeling, etc., under criminal penalties.

(d) §§ 51–48 to 51–50, first enacted in 1921, prohibiting sale of fish which is not fresh or which has been improperly cold-stored.

(e) §§ 53–1 to 53–6, first enacted in 1869, and amended from time to time, regulating the sale of poisons requiring

proper labeling, etc., under criminal penalties.

(f) §§ 55–1 to 55–7, enacted in 1927, regulating the sale of mattresses, requiring them to be tagged and labeled.

(g) § 162–12 (Act 73 S.L.1929) first enacted in 1921, allowing a person injured or defrauded by the use of false weights and measures to recover double damages from the violator.

74. After enactment of the Uniform Sales Act in 1929 and before 1956 (when the hula skirt was sold) the following laws, among others, were enacted by the Congress or the Hawaii Legislature (again referring to sections of the R.L.H.1955, unless otherwise indicated):

(a) The Federal Food, Drug, and Cosmetic Act, approved June 25, 1938, 52 Stat. 1040, 21 U.S.C.A. § 301 et seq. superseded the former Pure Food and Drug Act and covered the field of food and drugs much more comprehensively, particularly adding cosmetics. This law shows Congress's extreme concern for the *consumer* by allowing as a defense to criminal prosecution for violation of the act the giving and receiving of an express warranty of non-violation of the terms of the Act in connection with the sale, transmission, etc., of the article.

(b) The Hawaii Food, Drug and Cosmetic Act, enacted in 1941, chapter 51 of said Revised Laws (following substantially the Federal Act), see, particularly, §§ 51–6, 51–7 and 51–30.

(c) The Federal Flammable Fabrics Act, 15 U.S.C.A. § 1191 et seq., approved June 30, 1953, 67 Stat. 111, which by its terms applied not only to interstate commerce, but to local commerce within a Territory (15 U.S.C.A. § 1191(b) and

cited both Federal laws of local Territorial application, and Hawaii Statutes exemplifying this policy, which were in effect along with the preceding ones above

(c)). Although this court ruled during the trial and before the case went to the jury, that violation of this Act would not constitute negligence per se (a ruling the correctness of which this court now seriously doubts), such violation at least would constitute material evidence as to possible negligence, and the whole act itself, as indicated by its terms, as well as by its legislative history (see Note No. 33) is aimed at protecting the ultimate consumer or user of articles of clothing which might be so flammable as to be dangerous to life or limb.

(d) §§ 22–1 to 22–9, enacted in 1945, relating to grades and standards for fresh fruits and vegetables, prohibiting deceptive packing and labeling of fresh fruits and vegetables under specified civil and criminal penalties but with a saving clause which can, it is believed, only be interpreted to imply that there were other civil remedies available to the consumer, reading as follows:

"The penalties and remedies prescribed in this section * * * shall be concurrent and alternative and neither singly nor combined shall the same be exclusive and either singly or combined the same shall be cumulative with any and all other civil, criminal or alternative rights, remedies or penalties provided or allowed by law with respect to any such violation." (§ 22–2(e)).

(e) §§ 22–20 to 22–25, enacted in 1955, regulating export agricultural commodities under prescribed civil and criminal penalties with a similar saving clause preserving other possible civil and other remedies (§ 22–25(d)).

(f) §§ 22–40 to 22–53, enacted in 1945 and 1947, relating to processed food, providing for grades, standards, and classifications, labeling, etc., forbidding misrepresentation as to grade, mislabeling, etc. under prescribed criminal penalties, again saving other possible civil rights and remedies for violations similar to § 22–2(e) supra. Incidentally, although §§ 23–1 to 23–14 regulating dealers in farm products, appear to be aimed primarily at protecting farmers as sellers, nevertheless it is interesting to note that the legislature similarly preserves possible cumulative civil and other remedies otherwise permitted by law. (§ 23–13), indicating, along with the other laws of similar import above mentioned, and intent not to pre-empt the field of civil remedies by the express statutory criminal or civil ones.

(g) §§ 24–1 to 24–10, enacted in 1953, regulating simple feeding stuffs to be fed domestic animals, prohibiting adulterating or misbranding, and providing for enforcement similar to that of the Federal Food, Drug, and Cosmetic Act under criminal penalties.

(h) §§ 24–20 to 24–29, enacted in 1947, prohibiting sales, etc., of non-registered or improperly labeled mixed feeding stuffs under criminal penalties.

(i) §§ 25–1 to 25–9, enacted in 1945, providing for the regulation, labeling, etc., of poisons, such as insecticides, pesticides, etc., under criminal penalties. § 25–7(b) in this law provides as follows:

"Limitations of warranty with respect to the use of an economic poison may be printed upon the label thereof but no such limitations shall exclude or waive the implied warranty that the economic poison corresponds to all claims and descriptions otherwise made in respect thereto; nor shall any such limitations exclude or waive the implied warranty that such economic poison is reasonaby fit for use of any purpose for which it is intended according to any printed statement on the label or on any other matter accompanying such economic poison."

(j) §§ 26–5 to 26–15, enacted in 1945, regulating the sale of seeds, providing for labeling, etc., prohibiting false or misleading labeling or advertisements, etc., under criminal penalties.

(k) §§ 51–55 to 51–60, enacted in 1945, regulating the sale of flour, requiring its enrichment with certain exceptions, providing for observance of standards fixed pursuant to the Federal Food, Drug, and Cosmetic Act and for labeling in accordance with that Act, and providing criminal penalties for violations.

(l) §§ 158–1 to 158–15, enacted in 1937, relating to gasoline fuel and motor oil, providing for markings on containers, and labeling, forbidding misrepresentation or mislabeling, prescribing how prices shall be advertised, etc., prohibiting adulteration, and providing criminal penalties.

(m) §§ 205–40 to 205–46, enacted in 1945, regulating the sale of goods under the representation that they are surplus United States goods, etc., under criminal penalty and with provisions for civil injunction "by any private person in his own name." (§ 205–46).

mentioned, in 1956 when the hula skirt was purchased.[74.1]

Examination of the foregoing policy-fixing, locally applicable Federal and Hawaii statutes, together with the principles of the Hegarty case, discloses that these laws and principles cover *practically the entire field of ordinary purchases of goods by the average individual consumer*—they include food, drugs, cosmetics, clothing, fuel, animal food, economic poisons, and other types of merchandise. These items represent the *overwhelmingly greater part of the goods for which the annual family budget is expended*, and the trend favoring the consumer is continuing. If, as demonstrated ante, the majority of jurisdictions have made some exception to the allegedly exclusive limitation of remedies on implied warranty to the immediate buyer by the Uniform Sales Act, in deference to the overpowering demands of a local public policy to protect the consumer at least from injuries caused by defective products dangerous to life, limb and safety of human beings, there can be little question that Hawaii in 1956 had a sufficiently strong and definite public policy favoring the consumer in this regard to justify the allowance of a remedy to a non-buyer consumer not in privity with the seller, as in this case, who was injured by a defective and highly-flammable article of clothing, an article fully as dangerous to life, limb and safety as unwholesome food.

This court can see no rational basis for distinguishing between a public policy which favors protection of consumers of unwholesome and dangerous food and one which favors protection of a consumer injured by dangerously flammable clothing, in the allowance or disallowance of a remedy therefor, notwithstanding the language of the implied warranty provisions of the Uniform Sales Act.

Moreover, the Uniform Sales Act itself, evidencing the wisdom of its draftsmen,

expressly anticipates that the Act may not be exclusive or pre-emptive and may not fully cover the field in every case. Section 202–73, R.L.H.1955, quoted ante, Note No. 42, provides that *"In any case not provided for in this chapter, the rules of law and equity, including the law merchant, * * * shall continue to apply to contracts to sell and to sales of goods."* [75]

While those who drafted this law may not have fully realized the extent of the exception expressly recognized by this section, they did recognize that changes of condition or changes brought about by re-examination of older theories and decisions, would inevitably require application of new or modified rules, in line with the genius and capacity for growth of the common law, and thus made provision therefor.

Reading § 202–73 in conjunction with § 202–15 as to the implied warranties of fitness for use and merchantability, which state that *"Subject to the provisions of this chapter and of any statute in that behalf, there is no implied warranty * * except * * *"*, it seems that a further justification of the rule here adopted by this court—permitting non-buyers to sue sellers with whom they have no privity, for injuries caused by defective products, dangerous to human life, limb or safety—would be to hold that the reference to "any statute" in § 202–15 includes statutes fixing local public policy such as those cited ante in Notes Nos. 73 and 74.

Finally, in view of the numerous exceptions made by the various jurisdictions pointed out ante, allowing others than the immediate "buyer" as defined by the Uniform Sales Act (R.L.H.1955, § 202–75) to sue on implied warranty, whether under or in spite of the privity doctrine, it can be recognized that the Act is not exclusive and pre-emptive, and that, while it specifies what the "buyer" can or must do, it does not specify whether and under what conditions a non-buyer

---

74.1. See Prosser on Torts, 2d ed. § 34, pp. 152 et seq. discussing the *public policy* back of various criminal statutes,

the violation of which might be negligence per se, or evidence of negligence.

75. See, also 3 Williston on Sales, § 617.

consumer has a remedy for breach of implied warranty, leaving this to the common law. See authorities cited in Note No. 71 ante.

For the foregoing reasons the motions of the defendants for Judgment Notwithstanding the Verdict and for a New Trial should be, and hereby are, denied.

## APPENDIX I.

| State, etc. | Privity necessary in all cases | Privity necessary except in food cases | Privity necessary except where product inherently dangerous | Privity not necessary in any case | Uncertain | Uncertain generally but privity not necessary in food cases | No cases | No cases generally but privity not necessary in food cases | Privity probably not necessary in any case but not necessary in food cases |
|---|---|---|---|---|---|---|---|---|---|
| Ala. | X | | | | | | | | |
| Alaska | | | | | | | X | | |
| Ariz. | | X | | | | | | | |
| Ark. | X | | | | | | | | |
| Cal. | | X | | | | | | | |
| Colo. | | | | | | | X | | |
| Conn. | X | | | | | | | | |
| Del. | | | | | X | | | | |
| D. C. | X | | | | | | | | |
| Fla. | | | | X | | | | | |
| Ga. | | | | X | | | | | |
| Haw. | | | | | | | X | | |
| Ida. | | | | | | | X | | |
| Ill. | | | | | | X | | | |
| Inda. | | | | | | | X | | |
| Iowa | | | | | | | | X | |
| Kans. | | | | | | | | | X |
| Ky. | | | | | | | X | | |
| La. | | X | | | | | | | |
| Me. | X | | | | | | | | |
| Md. | X | | | | | | | | |
| Mass. | X | | | | | | | | |
| Mich. | | | | X | | | | | |
| Minn. | X | | | | | | | | |
| Miss. | | X | | | | | | | |
| Mont. | | X | | | | | | | |
| Neb. | | | | | | | X | | |
| Nev. | | | | | | | X | | |
| N. H. | X | | | | | | | | |
| N. J. | | | | X | | | | | |
| N. M. | | | | | | | X | | |
| N. Y. | | X | | | | | | | |
| N. C. | X | | | | | | | | |
| N. D. | | | | | | | X | | |
| Ohio | | | | | X | | | | |
| Okla. | | X | | | | | | | |
| Ore. | | | | | | | X | | |
| Penn. | | | | | | X | | | |
| P. R. | | | | | | | | | X |
| R. I. | X | | | | | | | | |
| S. C. | | X | | | | | | | |
| S. D. | X | | | | | | | | |
| Tenn. | | | | | | | X | | |
| Tex. | | X | | | | | | | |
| Utah | | | | | | | | | X |
| Va. | X | | | | | | | | |
| Vt. | | | | | | | X | | |
| Wash. | | X | X | | | | | | |
| W. Va. | X | | | | | | | | |
| Wis. | X | | | | | | | | |
| Wyo. | | | | | | | X | | |